IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| JOHN STEWART | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. <u>   3:22-cv-43   </u> |
| | ) | |
| | ) | **TRIAL BY JURY** |
| LLOYD J. AUSTIN, III, | ) | **DEMANDED** |
| Secretary of Defense, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| THEODOR CARTWRIGHT, | ) | |
| RHETT MURPHY, | ) | |
| FRANK TYLER AKERS, JR., | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| ELIZABETH GAYLE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# <u>COMPLAINT</u>

Plaintiff, John Stewart ("Plaintiff"), by counsel, files the following Complaint against Defendants, Lloyd J. Austin, III, United States Secretary of Defense ("Austin"), Theodor Cartwright ("Cartwright"), Rhett Murphy ("Murphy"), Frank Tyler Akers, Jr. ("Akers"), and Elizabeth Gayle ("Gayle"), jointly and severally.

Plaintiff asserts the following claims against the Defendants:

Counts I, II, III and IV against Austin – Under Title 42 U.S.C. § 2000e-16 and § 12117, for deprivation of rights and privileges secured to Plaintiff by § 2000e-2 of Title

VII of the Civil Rights Act of 1964 and by §§ 12112(a-b), 12201(d) and 12203(a-b) of the Americans With Disabilities Act ("ADA").

Counts V-IX against Cartwright, Murphy, Akers and Gayle – Under Virginia common law, for defamation, insulting words, tortious interference with contract, intentional infliction of emotional distress, and conspiracy.

Plaintiff seeks (a) compensatory damages and punitive damages in the sum of **$10,350,000.00**, plus (b) prejudgment interest on the principal sum awarded by the Jury pursuant to § 8.01-382 of the Virginia Code (1950), as amended (the "Code"), plus (c) reasonable attorney's fees and expert witness fees pursuant to Title 42 U.S.C. §§ 1988(b) and 12205, and (d) costs incurred.

## I.  **PARTIES**

1.     Plaintiff is a citizen of Virginia.  He was born in 1973.  He is a devout Catholic, married, with five children.  Plaintiff is a disabled combat veteran who suffers from post-traumatic stress disorder ("PTSD").  In June 2021, he received a medically necessary disability retirement from federal civil service following years of targeted abuse, defamation, disparagement and work sabotage by Cartwright, Murphy, Akers and Gayle. Plaintiff is now a farmer.  He grows crops and livestock with his wife and five children in Fluvanna County on a much diminished income, scarred for life by Defendants' lies and machinations that destroyed his health and career.  Plaintiff graduated from Wright State University ("WSU") with a Bachelor of Science in Electrical Engineering.  He also earned a Master of Arts in International Relations from WSU.  Between 1997 and 2001, Plaintiff served as a Commissioned Officer in the United States Army Signal Corps.  He deployed to Kosovo and Macedonia, where he witnessed unimaginable atrocity.  Between 2004 and

2014, Plaintiff served in various capacities as an intelligence officer and Department of Defense ("DoD") engineer. In 2014, he accepted a position with the Defense Intelligence Agency ("DIA"),[1] Rivanna Station, Charlottesville. Between 2014 and 2021, Plaintiff worked for DIA in the Office of Defense Technology and Long-Range Analysis as a Scientific and Technical Intelligence ("S&TI") analyst for over-the-horizon and novel technologies (2014-2017); as a team lead in the Office of Advanced Technologies Intelligence ("ATI"), Technical Targeting Branch ("TTB"), for multi-national, multi-agency, and Combatant Command Communities of Interest against foreign hard targets (2017-2019); in the Science and Technology ("ST") Directorate, as Senior Science and Technology Officer ("SSTO") to the Machine-assisted Analytic Rapid-repository System ("MARS") responsible for R&D solutions (2019-2020); and in the ST Directorate as lead action officer for development and implementation of cloud technology as archetype for the entire U.S. Intelligence Community ("IC") and DoD (2020-2021). Plaintiff has a Top Secret/SCI w/CI Poly security clearance. Plaintiff's work performance was consistently excellent. He was praised by superiors for his knack in getting disparate persons unified in the same direction on a target. Office Chief Michael Cleary observed that Plaintiff possessed the unique ability to galvanize multiagency and multinational teams. Plaintiff served his Country and DIA extremely well. His career was distinguished by honor, singular dedication, trust, integrity and service to DIA at the very highest level. His honesty, integrity, ethics, and reputation for truthfulness and veracity were integral to his success as an intelligence officer. The Defendants intentionally and maliciously discriminated against Plaintiff, terrorized him with false accusations, triggered his PTSD,

---

[1]    DIA is the principal advisor to the Secretary of Defense and Joint Chiefs of Staff on matters of military intelligence. [https://www.dia.mil/About/].

and forced him into disability retirement 15 years early, causing extreme and irreversible injury and loss.

2.      Defendant Austin is the United States Secretary of Defense.  He is named as a Defendant in his official capacity.  [https://www.defense.gov/About/Secretary-of-Defense/].

3.      Defendant Cartwright is a citizen of Virginia.  He lives in Charlottesville, Virginia (Albemarle County).

4.      Defendant Murphy is a citizen of Virginia.  He lives in Concord, Virginia (Campbell County).

5.      Defendant Akers is a citizen of Colorado.

6.      Defendant Gayle is a citizen of Virginia.  She lives in Albemarle County.

7.      Defendants Cartwright, Murphy, Akers and Gayle each worked with Plaintiff at DIA.  At all times relevant to this action, Defendants were fully aware of Plaintiff's PTSD and related symptoms, conditions and impairments.  Defendants engaged in years of misconduct for the sole purpose of triggering Plaintiff's PTSD, destabilizing Plaintiff and forcing him from Government service.  As senior, career United States intelligence officers familiar with military intelligence operations, active measures and disinformation techniques, Cartwright, Murphy, Akers and Gayle used classified government systems of a global intelligence agency to target Plaintiff and perpetrate a disinformation operation.  At all relevant times, these Defendants knew that their ruthless, outrageous, severe and pervasive actions would harm Plaintiff.

## II.  JURISDICTION AND VENUE

8.     The District Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1367 (supplemental jurisdiction).

9.     The Defendants are at home in Virginia, and subject to the Court's general personal jurisdiction and specific personal jurisdiction.

10.     Venue is proper in the Charlottesville Division of the United States District Court for the Western District of Virginia.  The events or omissions giving rise to the claims stated in this action occurred in the Western District of Virginia within the Charlottesville Division.

11.     Plaintiff has duly exhausted his administrative remedies.  On June 1, 2021, Plaintiff filed a formal individual complaint of discrimination.  DIA investigated the complaint from July 19, 2021 through November 9, 2021, and on November 26, 2021, Plaintiff received a copy of the Results of Investigation (ROI).  On March 17, 2022, Plaintiff requested a Final Agency Decision (FAD) on his complaint.  On May 13, 2022, DIA issued its FAD.  This action is timely filed within 90 days of Plaintiff's receipt of the FAD in accordance with 42 U.S.C. § 2000e-16(c) and 29 C.F.R. § 1614.407(a).

## III.  STATEMENT OF THE FACTS

12.     Plaintiff is a qualified individual under the ADA with mental or physical impairments that substantially limit one or more of his major life activities.  At all times relevant to this action, Plaintiff could perform the essential functions of his employment position.  Plaintiff's religion and PTSD were well-known to DIA.  Plaintiff brings this action because DIA harassed and retaliated against him because of his religion and because of his disability.  DIA's actions described in this Complaint were intentional and

discriminatory on their face. Plaintiff suffered extreme physical and emotional trauma as a result of the harassment, hostile work environment and retaliation he suffered at the hands of DIA.

13.    Between 2019 and 2021, Defendants targeted Plaintiff and conducted what amounts to an intelligence disinformation operation intended to destabilize Plaintiff and trigger his PTSD, destroy Plaintiff's will, and end his distinguished career. As part of the operation, Defendants engaged in a pattern of misconduct that included the publication and republication of multiple false and defamatory statements about Plaintiff.

### A.  Background

14.    The discrimination and unlawful acts at the heart of this case were motivated by actual malice. In spite of the fact that Plaintiff served in a visible leadership role that materially impacted bringing DIA into the cloud computing environment, was the point lead to secure data for storage and movement, never received any negative counseling, and was selected to go on rotation as ST representative to MARS over other highly competitive candidates, Defendants engaged in series of ongoing discriminatory actions that severely altered Plaintiff's work environment and eventually caused him to seek disability retirement. The genesis of the discrimination and defamation was an event that occurred in early January 2019. Cartwright issued Plaintiff a Letter of Reprimand ("LOR") because of Plaintiff's interactions with Murphy (described below) and after Plaintiff confronted Cartwright for manipulating the Talent Management System ("TMS") to promote someone in the Branch. Cartwright misrepresented that he had been ordered to issue the LOR. From this point forward, in spite of his top performance, Defendants singled out Plaintiff, subjected to a hostile work environment

based on his religion and disability, treated him with aggression and contempt, yelled at him on the phone, told him he was a problem, attacked him on his personal action form ("PAF"), and ruined any opportunity he had for promotion.  The mistreatment was so severe and unprecedented that Johnny O. Sawyer, then DIA Chief of Staff [https://www.linkedin.com/in/johnny-sawyer-2b59a313a], intervened.    Mr. Sawyer overruled Cartwright's performance appraisal for FY 2019 because it was fraudulent, and upgraded Plaintiff's performance rating to Outstanding for which Plaintiff received a bonus.  Defendants did not learn any lesson from their misconduct and rebuke in FY 2019.  In FY 2021, they denied Plaintiff a promotion based on further fabrications about Plaintiff's job performance.

15.    Defendants subjected Plaintiff to a continuous litany of discrimination. Murphy repeatedly abused Plaintiff because of Plaintiff's religion.  Murphy modified Plaintiff's duty uniform in a manner that was expressly offensive and hateful to Plaintiff's religion.  Murphy had bright orange boot blousers stitched into his uniform, and told Plaintiff he needed to have his "Protestant orange" in the "Catholic green" uniform Plaintiff was forced to wear.  Murphy repeatedly lectured Plaintiff about the Catholics in Northern Ireland, implying that Plaintiff, as a practicing Catholic, held beliefs and prejudices against Irish Protestants.  Murphy's relentless focus on Plaintiff's religion was completely unrelated to the work Plaintiff performed for DIA.  Murphy's bigotry was very offensive.  Plaintiff eventually told Murphy that he knew all about Northern Ireland because he (Plaintiff) spent a significant time in Ireland and did his master's thesis on Northern Ireland issues.

16.     In addition to his bigotry, on April 15, 2019, Holy Monday in the Catholic calendar, Murphy, who was referred to by DIA Security as "space boy," came to Plaintiff's workspace in a black sweat top and shorts.  Murphy had something in the pocket of his shorts.  Murphy sat in the middle of the workspace, and talked about himself with a blank stare in his face.  Murphy then reached into the crotch of his shorts, and pulled out a grimy little bottle of wine, stated it was from Israel, and that he got it for Plaintiff because he was "Catholic" and that he thought Plaintiff would "like it".  Plaintiff was disgusted.  He told Murphy that he was not accepting the bottle of wine.  Plaintiff asked what could have made Murphy think Plaintiff would appreciate the bottle of wine that he had taken out of his shorts.  Murphy and Plaintiff did not have a friendly relationship to start with, so Murphy could not have thought Plaintiff would "like it".[2] The whole incident was strange because Murphy had mocked and abused Plaintiff in the past about his religion.  When Plaintiff reminded Murphy that it was Holy Monday, Murphy suggested that Plaintiff might "appreciate having the wine on Holy Thursday for the Seder meal, as part of Jewish Passover."  Plaintiff informed Murphy that the Pope had decreed Catholics not to perform the Jewish Seder Meal.  Murphy acknowledged that he knew "people" who did observe the Seder meal.  When Plaintiff repeated that he did not want the bottle of wine, Murphy stood up and came face-to-face with Plaintiff (who was still seated), grinned, advised Plaintiff that he would take the bottle out of the secured workspace because he had "smuggled it in", and chuckled as he walked away.  When

---

[2]     Further complicating matters, if Plaintiff had accepted the bottle of wine, he would have been disciplined because wine was prohibited in the secured workspace. Unlike Murphy, who got out of trouble easily and was even promoted to Division Chief, Plaintiff would have walked into a trap if he had taken the offering pulled out of Murphy's shorts.

Plaintiff informed Cartwright about the wine incident with Murphy and of how Murphy's actions were offensive to his faith, Cartwright claimed it was "incredulous" and then burst out laughing.  Plaintiff also informed DIA Security that Murphy had brought wine into the secured workspace (wine was on the list of prohibited items).  Security told Plaintiff that Murphy's conduct was "problematic", and to report the incident online, which Plaintiff did.[3]  Murphy's insulting gesture continued the hostile work environment Murphy created by singling Plaintiff out for bigoted, off-topic, un-work-related conversations.  Murphy continued to disrespect Plaintiff by expressing that he had problems with the Catholic theology and moral teachings.  No formal action of any kind was taken against Murphy.[4]

17.    Murphy held a grudge against Plaintiff as a result of Plaintiff's complaints about Murphy's religious discrimination.  That grudge bled over into Murphy's reviews of Plaintiff's job performance.

18.    In 2021, Murphy, Cartwright and Akers conspired to injure Plaintiff in his employment by misrepresenting/fabricating incidents that they included in Plaintiff's PAF.  Although there was a conspicuous absence of any negative counseling or other discipline in Plaintiff's employment file, Cartwright published an email in which he falsely accused Plaintiff of regressing as a professional and being in trouble in MARS and CIO.  The charges were completely false.  When Plaintiff spoke with Akers, who was Plaintiff's rater in CIO, about his PAF, Akers referred expressly to Plaintiff's disability

---

[3]    This was not the first time that Murphy brought or offered to bring unauthorized items into the DIA secured workspace.  Murphy previously offered Plaintiff pirated media, which was also prohibited in their secured workspace.

[4]    Murphy and Cartwright did not treat any other employee the way they treated Plaintiff.

during the conversation.  Akers' intimate knowledge of Plaintiff's disability, contained in

Plaintiff's retirement package, was the controlling factor in the PAF input Akers provided

to Cartwright.  Akers told Plaintiff that his (Akers') input needed to be consistent with

Plaintiff's disability and his suitability for promotion and medical condition.  Contrary to

Akers' belief, Plaintiff's suitability for promotion and disability were not connected.

Akers provided his negative input regarding Plaintiff's promotion suitability because of

Plaintiff's disability.  Cartwright and Murphy used Akers' discriminatory input, along

with their own misrepresentations about "behavioral issues", in deferring their

recommendation of Plaintiff for a promotion to GG-14.[5]

19.    Defendants' deferral of Plaintiff's promotion was emotionally and

financially devastating and unjust because it was based on discrimination and falsehoods

---

[5]    Akers' PAF input was rife with falsehoods.  Akers falsely claimed that
Plaintiff's Team Lead had reported that Plaintiff failed to contribute to the Team, but, in
truth, Plaintiff had finished all tasks and the Lead had not checked what Plaintiff had
completed, and, indeed, Plaintiff was put in charge of key taskings when that same Team
Lead relieved a previous task lead of responsibilities.  Akers also claimed that a female
contractor expressed that she would quit if Plaintiff became Team Lead, but, in truth, that
same contractor was assigned to two teams led by Plaintiff, and she did a stellar job on
both teams.  Akers told Plaintiff that the negative reference he gave was due to
"problems" Plaintiff allegedly had with three individuals in CIO.  Akers admitted that
Cartwright had exaggerated Akers' input when Cartwright stated that Plaintiff had
"regressed."  Plaintiff reminded Akers that he had never informed or discussed with
Plaintiff the so-called problems with the three individuals, that Akers had the obligation
to do so, but Akers never did.  In truth, the incidents Akers brought up were incidents
where *Plaintiff* received poor treatment from the three individuals.  There were multiple
witnesses to the incidents, which proved that Akers' accusations were baseless and
motivated by a desire to hurt Plaintiff because of his disability.  In reality, Plaintiff had no
problems in MARS.  If there had been any problems in MARS, CIO would not have
accepted Plaintiff and assigned him even larger duties than those Plaintiff performed for
MARS.  Akers conveniently fabricated a statement that he had counseled Plaintiff, but,
again conveniently, Akers failed to provide any substantiating evidence to prove that he
did.  Like Cartwright, Akers was willing to falsify statements to DIA for the sake of
covering up the discrimination.

published by Cartwright, Murphy and Akers.[6]  The recommendation to defer promotion meant non-promotion was guaranteed.  Top comments and top ratings are needed for career advancement at DIA, which ultimately affects pay, benefits, and retirement.

## B.   Defendants' Discrimination, Defamation and Misconduct

1.   *Cartwright*

20.    At all times relevant to this action,. Cartwright was the GG-14, Branch Chief of ATI.  Cartwright was Plaintiff's first level supervisor and rater.  He was aware of Plaintiff's religion because Plaintiff informed him that he was Catholic and because Plaintiff kept several religious items on his desk.  Cartwright knew about Plaintiff's disability because Plaintiff told Cartwright of his PTSD in January 2019, and provided a doctor's note that detailed other medical issues.  Due to his disability, DIA also allowed Plaintiff to work four ten-hour days to give him the flexibility to attend regular Friday medical follow-ups for his PTSD.

21.    Between 2019 and 2021, Cartwright published multiple false and defamatory statements about Plaintiff that impaired and adversely affected Plaintiff's employability.  Cartwright's defamation was part of a pattern of discriminatory conduct directed at Plaintiff and calculated to harm his employment and professional reputation. In 2021, Cartwright falsely stated that an unspecified person in the MARS program at DIA asserted that Plaintiff had "behavioral issues" within MARS while Plaintiff was SSTO.  Cartwright also falsely stated that Plaintiff's MARS rotation was intended to be a two year rotation, but was "curtailed" for "behavioral issues".  Cartwright published and republished defamatory "Conversation Trackers" alleging that he had to regularly speak

---

[6]       There were no other employees in ST whose promotions were deferred.

with Plaintiff about Plaintiff's working relationships.  The "Conversation Trackers" were complete fabrications.[7]  They illustrate the extent to which DIA career officers would go to harm one of their own.  Cartwright further accused Plaintiff of a serious integrity issue involving Plaintiff's working relationship with the local National Geospatial-Intelligence Agency ("NGA") office.  Specifically, Cartwright stated that Plaintiff "intended to deceive" DIA management concerning the existence of "friction" that occurred between DIA and NGA as a result of changes that Cartwright, Gayle and others had made to a DIA/NGA slide presentation.  Cartwright enlisted Gayle and LTC Daniel Gohlke ("Gohlke") to lie for him and support the false and defamatory statements about Plaintiff.

22.     The central purpose of Cartwright's misrepresentations (and the gist of Cartwright's defamatory statements) was to portray Plaintiff as personally and professionally unstable, dangerous, unprofessional and untrustworthy.  Cartwright, Murphy, Akers and Gayle jointly undertook the smear campaign using the same means and methods – publication of unsubstantiated and undocumented accusations about "behavioral issues" (tacitly attributed to Plaintiff's combat-related disability) and other unspecified matters.  The common purpose of Cartwright's actions and communications was to distort discourse; erode trust; weaken accomplishments; exacerbate general social issues and malaise; undermine safety; and inflict irreparable damage on the reputation of one individual, Plaintiff.  Defendants invoked intangible "#Metoo" and "woke" concepts

---

[7]     In 2019 and again in 2021, Cartwright created "Conversation Trackers". These "Conversation Trackers" were supposed to "track" conversations that allegedly occurred between Cartwright and Plaintiff.  In reality, Cartwright designed the "Conversation Trackers" to give the appearance of legitimacy to Cartwright's claims that he had spoken to Plaintiff about certain matters.  In truth, Cartwright manufactured the "Conversation Trackers" **after-the-fact** to completely misrepresent the substance of conversations.  In 2021, Cartwright even added a date to the "Conversation Tracker" to make it look legitimate.

and used disinformation.  Defendants believed that the perceived severity of the putative conduct, coupled with Defendants' ranks in the military, would ensure credibility at the Agency level.

23.    DIA maintains a storied reputation and fulfills a critical role as primary source of military intelligence in the IC.  Defendants' actions and statements ran counter to DIA history and sullied DIA's name.

24.    Cartwright harbored a grudge against Plaintiff, and was out to get him for many years.  Plaintiff endured fake reprimands from Cartwright about discourteous and disrespectful conduct that had to be removed from Plaintiff's record because the events never occurred or were intentionally distorted.  Plaintiff's 2019 performance appraisal, for instance, had to be adjudicated by DIA Chief of Staff, Johnny Sawyer ("Sawyer"), who ruled against Cartwright.  Sawyer removed Cartwright's false statements about professionalism and performance issues from the record, rated Plaintiff as Outstanding and awarded him a bonus.

25.    Cartwright's statements about Plaintiff and alleged "behavioral issues" are materially false.  Plaintiff was an intelligence officer, GG-13.  At the time of Cartwright's defamation in 2021, Plaintiff was on rotation to CIO from MARS after a year with MARS.  Plaintiff was put on rotation to CIO because he was a top performer.  Indeed, Plaintiff was selected over three other highly competitive candidates to be the ST Representative to MARS, and his team received an award for the work they did. Plaintiff's original rotation to MARS was intended to be for 1-2 years.  The rotation to MARS was not "curtailed", and certainly not for any "behavioral" reasons.

26.     Plaintiff's duties at DIA were whole-of-agency in scale with the potential to impact the entire United States Intelligence Community.  These are not duties given to a person with "behavioral issues".  In 2021, Cartwright and Akers combined to falsely accuse Plaintiff of having "professional challenges" dealing with his peers.  However, Plaintiff did not receive a single adverse counseling from MARS or CIO.  The accusation that Plaintiff had "behavorial issues" was unsupported and fabricated.

27.     Cartwright fabricated the incident with the local NGA office in order to implicate Plaintiff in intentional deception and wrongdoing.  Cartwright used people in his branch to bear false witness.  The evidence went to a Performance Review Authority ("PRA"), who threw out the statements from Cartwright.  Digital forensics revealed that all of Cartwright's evidence post-dated the reconsideration process initiation, meaning he made it up after the fact.

28.     On March 18, 2021, in response to Plaintiff's 2021 PAF submission, Cartwright stated in a published email that Plaintiff was a poor team player and leader and rated Plaintiff as a "defer" for promotion because of a "lack of progress growing past shortcomings".   Cartwright  falsely  stated  that  there  were  "gaps"  in  Plaintiff's professionalism, that Plaintiff's appraisals noted "trouble integrating with peers", and that "Mr. Stewart's professionalism and ability to work well with others has regressed".

29.     Cartwright misrepresented that Plaintiff had had unspecified "problems" with three (3) individuals (including, Kevin West and LTC Stacy Graham with the Office of  the  Under  Secretary  of  Defense  or  Intelligence  ("USDI")  and  Emily  Cwengros, Contractor).  No complaints were made.  No counseling occurred.  Prior to defaming Plaintiff, Cartwright never informed Plaintiff about the so-called "problems".

30.    Cartwright completely manufactured the claim that Plaintiff had problems with representatives of USDI.   Kevin West ("West") was openly abusive and condescendingly.   He initially addressed Plaintiff by asking, "With WHOOOOM am I SPEAKING?"   Plaintiff provided his name, duty title, and contact details.   A separate contractor in that meeting was openly abusive to DIA's Senior Technical Advisor, a female employee.   She lodged a formal complaint and cc'd Plaintiff on it.   She, along with Mr. Jikky Ferrer ("Jikky"), who was the action officer for Mac Townsend ("Mac"), then acting CIO for DIA, witnessed all of this.   In a meeting later that day, Jikky reported to Mac that Plaintiff had "deftly" handled the "antics" of West and Graham and had represented DIA well.   During the CIO rotation, Plaintiff answered to Mac.   Later that day, the CIO team met with Akers, CIO Branch Chief, and confirmed to him that West was "recalcitrant", "openly rude" and "unprofessional".   Akers never counseled Plaintiff for any performance issues.   Cartwright's stories (obtained from Akers) were total fictions.

31.    Cartwright and Murphy generally misreported that Plaintiff had extreme difficulty working with different people, communicating any kind of disagreement or difference of opinion with a variety of personality types and ranks, was very caustic, and caused a lot of disruption at work.   However, they could not cite a specific incident in which any of this had been reported or was true.   Cartwright suggested that "someone" had to be removed from Plaintiff's team in early 2019 because Plaintiff was "bullying" the individual, but this statement was also knowingly false.   Actually, the individual had been openly abusive of Plaintiff in front of other employees.   A. Scott Morgan ("Morgan") was a witness to that fact, all of which was reported to Cartwright.   The

employee removed from the team, Art Riles ("Riles"), refused to work except on things specific to his background. He also sent abusive and condescending communications outside the Agency from the office. As the team lead, Plaintiff asked Riles to run that kind of thing by Plaintiff first. That is when Riles got abusive. Plaintiff privately counseled Riles, and provided the transcript of the counseling to Cartwright, who commented that it was a very detailed record. All of these records still exist. Riles had to be removed from the team because he wouldn't work, and for no other reason. Cartwright's statements about Plaintiff were knowingly false.

32.    Cartwright published the March 18, 2021 statements after learning that Plaintiff had filed a whistleblower complaint with DIA's Office of the Inspector General ("OIG") (see below). Plaintiff immediately called out Cartwright's retaliation and reprisal:

---

Stewart, John C CIV DIA (US) <John.Stewart@dodiis.mil>

Mon 3/22/2021 11:15 AM

**To:** Sawyer, Johnny O CIV DIA (US) <Johnny.Sawyer@dodiis.mil>

Sir,

I am sorry to bother you with this ongoing issue with Mr. Cartwright. This is the second year in a row in which Mr. Cartwright has made demonstrably false official statements about my professionalism, integrity, and ability.

I have forwarded Mr. Cartwright's comments to my rating chains of the past two rating periods as he claims his words originate with them.

At no time has anyone from MARS to CIO counseled me on any lack of ability, shortcomings, communications issues, etc. Quite the contrary, for example, I am the POC for the communications plan for the DIA Data Hub to socialize this effort to the agency as a whole, among other duties.

Mr. Cartwright has demonstrated a repeated pattern of behavior to make claims that are not substantiated in fact, such as the 2019 appraisal that you reviewed and found fully in my favor. Mr. Cartwright has been permitted to wage what appears to be some form of personal vendetta against me for far too long. This latest attempt to intentionally and specifically curb my ability to advance in the agency is a clear demonstration of abuse of authority, lack of integrity and trustworthiness, libel, and endemic bullying. Apart from Mr. Cartwright, my work experience is quite peaceful.

I eagerly await a response at your earliest convenience.

Very Respectfully,
John C. Stewart

---

33.    Murphy doubled-down and repeated Cartwright's false statements about Plaintiff.  Murphy falsely represented that Plaintiff failed to meet the very minimal qualifications to be a GG-14; that Plaintiff had extreme difficulty working with different people; that Plaintiff had extreme difficulty communicating any kind of disagreements or difference of opinions with a variety of personality types and ranks; that Plaintiff was caustic; and that he caused a lot of disruption at work.  As part of the ongoing disinformation operation against Plaintiff, Cartwright and Murphy mimicked and repeated each other in order (a technique known as astroturfing) to make it appear that there were multiple corroborating sources and organic support for Cartwright and Murphy's positions (when there was only the Defendants acting in concert) and to amplify the false narratives.

34.    Cartwright falsely stated that "accuracy" was an issue for Plaintiff, and that Plaintiff tended to "play loose" with the facts when reporting things up the chain of command.  Cartwright falsely asserted that he discussed this issue with Plaintiff "every month for six months straight".  Strangely, there is not a single document to corroborate Cartwright's representations.

35.    Cartwright falsely stated that he was unable to verify the accuracy of statements by Plaintiff on his 2021 PAF about work Plaintiff did with entities outside the United States.  Cartwright could have easily verified the work performed by Plaintiff by, for example, emailing the persons for whom Plaintiff performed the work or by picking up the phone.  Cartwright's statements were false because he knew he had done nothing to verify the accuracy of Plaintiff's statements and, thus, Cartwright completely misrepresented the extent of his knowledge.

2.    _**Murphy**_

36.    Murphy, Cartwright, Akers and Gayle falsely stated that Plaintiff was repeatedly abusive towards female employees.  Murphy had a motive to lie.  Murphy's original false statements about Plaintiff's so-called "abuse", published in 2019 (republished in 2021), occurred on the immediate heels of Murphy being counseled at the Senior Executive Service level and by DIA Security for offering pirated media to Plaintiff inside a Sensitive Compartment Information Facility (SCIF) and "smuggling" (Murphy's word) wine into the SCIF inside the crotch of his workout shorts in an attempt to compromise Plaintiff.

37.    When Murphy published the false statements, he cc'd Gayle, who was not in the chain of command.  Nowhere did Murphy include his boss.  Nowhere did Murphy say anything about involving Employee Management Relations.  There was no counseling, no documentation, no sanction, no removal or punishment of any kind because the "abuse" of the anonymous "females" never occurred.  Murphy did not identify the name of a single female employee.  Murphy's actions were solely intended to destroy Plaintiff's ability to perform work for DIA or seek advancement and opportunity.

38.    Murphy falsely attributed statements to Plaintiff and to others – statements that, in fact, were never made. _Masson v. New Yorker Magazine, Inc._, 501 U.S. 496, 510-511 (1991) ("False attribution of statements to a person may constitute libel, if the falsity exposes that person to … [hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation]… A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation.  First, the quotation might injure because it attributes an

untrue factual assertion to the speaker … Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold.") (citations omitted).

39.    Contrary to Murphy's representations:

a.    Plaintiff never stated that he did not get a promotion because he did not wear "short skirts";

b.    After passing a Pride Month banner, Plaintiff did not state to Murphy that Catholics are not going to be able to work at DIA because it has become a "culture of death";

c.    DIA officers did not state that if there was one person who could go in and "shoot the place up", it would be Plaintiff;

d.    The Deputy Office Chief of MARS, whose name Murphy could not even recall, did not state, "it's easier to have nobody here than it is to have John here."

40.    The defamatory gist of Murphy's statements is in the false attribution of the statements to Plaintiff and others. *Desmond v. News and Observer Publishing Company*, 375 N.C. 21, 846 S.E.2d 647, 676 (N.C. 2020) ("statement attributing an opinion critical of plaintiff to an expert in her field is an actionable assertion of fact.  In such an instance, 'the sting' is in the attribution alone—the false **assertion of fact** that an expert in plaintiff's field holds an **opinion** critical of plaintiff"); *Tharpe v. Saunders*, 285 Va. 476, 737 S.E.2d 890, 895 (2013) ("*Saunders' statement of fact*—'Tharpe told me that

Tharpe was going to screw the Authority like he did Fort Pickett'—if believed by the hearer as coming from Tharpe, by its very nature is alleged to have defamed Tharpe … Therefore, regardless of the truth or falsity of the matters asserted in the quote attributed to Tharpe, Saunders' statement is an actionable statement of fact.").

41.     Murphy deliberately made Plaintiff appear sexist, demeaning, bigoted, unprofessional and unstable.  Again, not a single one of the incidents was documented because, in truth, Murphy made the events up out of whole cloth and falsely and maliciously attributed the statements to Plaintiff and others.  Murphy knew the events never happened.

42.     Murphy was so bent on hurting Plaintiff that he even suggested that Plaintiff made some of the statements because he was Catholic.

43.     In June 2021, after Plaintiff had retired on disability, Murphy emailed DIA Police stating or implying that Plaintiff was violent, had a temper, and might hurt someone.  Murphy copied multiple people on the email.  Cartwright then echoed the same defamatory statements.  Murphy claimed that three (3) people had told him in March 2019 that they were afraid Plaintiff was "going to hurt someone", so he called DIA Security.  In truth, the people indicated Plaintiff was behaving differently than he normally did and was carrying around a backpack which he would not let go.  Murphy falsely stated that Plaintiff "always exhibited problematic behavior".  Cartwright falsely represented to DIA Security that Plaintiff had a temper and that Cartwright had reservations that Plaintiff might resort to intimidation.  At no point did Murphy or Cartwright ask for intervention from DIA, any counseling, removal, termination, or other sanction that would be considered normal and, in fact, required of management in DIA.

Murphy and Cartwright ignored DIA policies and protocols.  Plaintiff did not carry the backpack because he was violent.  Rather, as Murphy and Cartwright knew, Plaintiff had had foot surgery in March 2021, and he carried his lunch and medicines in the backpack. Defendants' use of DIS Police against Plaintiff was a disgusting abuse of power and a way of destabilizing Plaintiff because of his PTSD.

44.     Murphy made broad, sweeping, generalized accusations about Plaintiff (which were all false) – such as Plaintiff "had a problem trying to provoke or insult other people", Plaintiff "had difficulty working in a lot of different environments", "many people found him insulting", Plaintiff "caused a lot of unnecessary drama", Plaintiff caused "perhaps discriminatory situations with some of our older employees", and "we had known John was a difficult personality" – but provided no details.    The undocumented generalizations were a product of Murphy's imagination.

45.     Murphy, Cartwright, Akers and Gayle avoided detail, so as to increase the difficulty of disproving their lies.

46.     Defendants' pattern and practice of debasing Plaintiff with generalized statements was a technique consistently employed to attack Plaintiff's career and reputation.  Defendants fastidiously avoided DIA's normal procedural practices, which was to document the kinds of serious issues they claimed Plaintiff exhibited.  Defendants avoided DIA protocol because they knew their statements were baseless.

**3.** *__Akers__*

47.     In 2021, Akers falsely stated that Plaintiff had work performance issues at CIO.  Akers parroted the false statement that Plaintiff was having trouble establishing relationships with certain members of USDI and certain people within CIO.  Akers also

stated or implied that the Common Data Fabric ("CDF") project got moved because of Plaintiff.

48.     Akers never brought up any issues with Plaintiff's performance until Akers was contacted by Cartwright.  Cartwright solicited derogatory information about Plaintiff and a derogatory rating.  Akers manufactured "issues" that never existed.  For instance, Akers falsely claimed that Plaintiff stated that his supervisors in the MARS program, John Dailey and Joy Bernardo, did not like him.  In truth, neither Dailey nor Bernardo ever gave Plaintiff any negative feedback or counseling.  Bernardo was not even in Plaintiff's rating chain.  Plaintiff never once had an individual conversation with her.  In reality, while at CIO, Plaintiff took all direction from DIA CIO Defense Intelligence Senior Level ("DISL") officer, Mac Townsend.  Akers made no effort to contact Mac because Akers knew that Townsend would not support the false narrative drummed up by Cartwright and Akers.

49.     Akers initially admitted that he never counseled Plaintiff about any performance issues, and, indeed, there is not a single counseling statement prepared by Akers.  Akers could not provide any specific support for his false statements because he knew none existed.  Akers had no evidence related to Plaintiff's professionalism, bearing, work ethic, day-to-day attitude, personal and professional integrity, etc.  He simply levelled generic and baseless accusations, hoping that his management position would somehow provide the missing credibility.

50.     Akers' statements about CDF were materially misleading.  The CDF project was put on the back-burner, but not because of anything Plaintiff did or did not do.

51.     Akers believed that because Plaintiff was disabled he was unable to advance professionally and was ineligible for a promotion.   Akers made the false statements and gave a negative rating because of Plaintiff's disability, an impairment triggered by Defendants' actions.

52.     Plaintiff and Akers spoke via MS Teams, and Akers asserted that Cartwright had "exaggerated" what he had been told by Akers.   Following this conversation, Plaintiff had a call with Akers' Branch Chief Michael J. McCabe ("McCabe").  McCabe told Plaintiff that he and Akers actually recommended Plaintiff for a "P" – promotion – in his PAF.  McCabe told Plaintiff that he wanted to retain Plaintiff in CIO because Plaintiff's work was good.

53.     In a conversation in March 2021, Akers brought up Plaintiff's working relationship with Emily Cwengros ("Cwengros").   Akers falsely represented that Cwengros said to him that she would quit if she were forced to work with Plaintiff. Cwengros was on both teams that Plaintiff lead at CIO.  She did a superb job.  There were no issues between Plaintiff and Ms. Cwengros.  She never quit and never expressed any interest in doing so.  Plaintiff asked Akers point blank:  if Cwengros' statement was true and accurate, "why am I leading the development of a key requirements document for the DIA Data Hub (DDH) effort as well as lead coordinator for the communications campaign for DDH?"  Akers did not respond.

54.     Akers also falsely claimed that Ted Brunjes ("Brunjes") would corroborate Akers' false accusations of performance issues.  Brunjes reached out to Plaintiff via MS Teams.  In a telephonic conversation that followed, Brunjes advised Plaintiff that he had relieved the team lead for the Functional Requirements Document

("FRD") for the DIA DDH.  Brunjes appointed Plaintiff as the new team lead immediately to get the project across the finish line.  The DDH FRD was intended to serve as a template for the entire IC.  Plaintiff and his team made incredible progress and were regularly lauded by the Senior Technical Advisor to CIO Engineering.

55.    Plaintiff's other duty at CIO was the team lead to plan the public affairs (communications plan) for DDH.  This assignment, which also came from Brunjes, would have been a particularly bad fit for someone with "performance issues" or "behavioral issues".  Akers' statements about Plaintiff's job performance were knowingly false and were belied by the fact that Plaintiff was assigned increasingly important job responsibilities, and was a top performer according to every matrix.

**4.    _Gayle_**

56.    Between April 2019 and March 2021, Cartwright, Murphy and Gayle manufactured and publicized a false narrative that Plaintiff was repeatedly abusive towards female employees from the time he began working for the ST Directorate.  The narrative published by Cartwright, Murphy, Akers and Gayle was intended to evidence an overall claim that Plaintiff had created a "hostile work environment" at DIA.  In furtherance of the scheme, Gayle published emails in which she falsely stated that Plaintiff engaged in a pattern of degrading and sexist comments.  In the same vein as Murphy, Gayle falsely claimed that Plaintiff referred to women achieving promotions at the senior level of DIA as the "invasion of the mini-skirts".  Gayle asserted that the insulting comments "have created a hostile work environment".

57.    Gayle's statements are materially false.  The events never happened. Further, Gayle waited as much as 28 months before ever making the false accusations.

She gave no actionable specifics because none exist.  There were no complaints made about Plaintiff by any female employee, a fact that was well-known to Gayle, Cartwright and Murphy prior to the time they launched their defamation campaign and published the false statements.

58.    As a matter of order and discipline, had Plaintiff behaved in the manner described by Gayle and her confederates, DIA would have suspended his clearances and accesses pending an investigation.  No investigation occurred.  Plaintiff was never counseled or interviewed by anyone because, in truth, he was never abusive towards any female employee of DIA.  Indeed, DIA decided to remove the derogatory information about "abusive behavior" from Plaintiff's record because it was abjectly false.

59.    In furtherance of the conspiracy, Murphy complained and falsely stated to superiors that Plaintiff's behavior was "grossly unprofessional … He continues to lie and spread descent in his work center."  Murphy claimed that the "behavior" had been going on for "4 years".  Murphy, Cartwright and Gayle's actual malice, spite, ill-will and contempt for Plaintiff was obvious in emails.  Murphy was unable to contain his desire to hurt Plaintiff:

Will removing the derogatory information be accompanied by his stopping to degrade women's achievements? Will there be an accompanying restoration of reputation for the targets of John's malicious lies? (there are several.)

Rhett B. Murphy, Lt Col, USAF
Deputy Chief -  Targeting, Engineering, and Test Division (ATI5)
Office of Advanced Technologies Intelligence (ATI)
Directorate for Science & Technology (ST)
Defense Intelligence Agency (DIA)
Charlottesville – 1088D
TSVOIP – 982.4370
Secure VTC – 912-2902
Comm - 434-995-4307
(JWICS) – Rhett.B.Murphy@coe.ic.gov
(SIPR) -  rhett.murphy@dia.smil.mil
(NIPR) - rhett.murphy@dodiis.mil

60.     Gayle further misstated that Plaintiff was a "danger" to others and had "multiple angry outbursts".  In 2019, as part of the retaliation against Plaintiff, Murphy approached Gayle about fabricating evidence that Plaintiff was making the "work environment hostile".  Gayle agreed to do so.  Gayle sent Murphy an email that purported to document "multiple angry outbursts", concerns allegedly raised by others about Plaintiff's mental state and stability, "hostile" and "heated" exchanges, arguments and "volatile" conversations, "aggressive and combative behavior" and "negative attitude" – none of which "incidents" ever occurred.

61.     Every aspect of Defendants' actions was planned, including use of the artifice that Cartwright, Murphy, Akers and Gayle cared about Plaintiff and were looking out for his best interests and the best interests of the DIA.  In an email published in 2021, Gayle feigned that she was "concerned" about Plaintiff's "mental stability and for the safety and security of everyone in the branch."

62.     Murphy republished Gayle's email to Cartwright, who used the fictitious events as part of a false narrative that Plaintiff had professional and performance issues.  Even though the narrative was determined to be baseless and was scrubbed from Plaintiff's 2019 performance appraisal, Cartwright, Murphy and Gayle recycled the false narrative in 2021.  Recycling a narrative after being notified that the facts were false and defamatory is evidence of Defendants' reckless disregard for the truth.

63.     At the time she republished the false statements in March 2021, Gayle knew that Plaintiff was not a danger to anyone in the office.  Gayle knew that Plaintiff was confined to a knee scooter and could not harm anyone.  She knew that the backpack Plaintiff carried with him did not contain any dangerous device or substance.  It

contained Plaintiff's lunch and medicines. Further, Cartwright was informed by official letter from Plaintiff's doctor at the time, Dr. Mix, that Plaintiff had had a strong adverse reaction to the medicine gabapentin, which has a very publicly known track record for mood altering effects. At the time that Gayle published her false statements, Defendants were well aware of medical causation and, therefore, chose to outright lie and misrepresent the facts in order to inflict professional harm upon Plaintiff.

64.    Significantly, Gayle (and Cartwright and Murphy) also knew that Plaintiff was about to present to an international Allied intelligence group. Gayle knew that Plaintiff would never have been allowed to present to that high-level group if Plaintiff was actually a danger to anyone at DIA.

## C.  Plaintiff's Whistleblower Complaint

65.    On May 14, 2020, Plaintiff filed a whistleblower complaint with then Director of DIA, General Robert P. Ashley, Jr. Plaintiff informed General Ashley that:

> I am currently on an internal rotation as the ST representative to the MARS program. Under my permanent ST managers, Mr. Theodor Cartwright (ATI-5A Branch Chief) and Mr. Robert Heathcock (ATI-5 Division Chief), I have experienced religious and disability discrimination, false official statements in a formal proceeding, falsification of evidence, and work sabotage that possibly exceeds $1-million in cost to the U.S. taxpayer. Witnesses and documentation pursuant to this were provided to the OIG approximately six months ago.
>
> Regarding the work and personal sabotage, I have briefed the project in question to you in person twice. The end use customer articulated that ours was the only IC element to perform such work. Mr. Heathcock forwarded that to the Office level as evidence of community impact. Our team was requested by ODNI as a plenary keynote presentation at a multinational counterproliferation conference, which Allied nations described the work as "intelligible, unprecedented, and repeatable". Allied elements reached out for future collaboration. Mr. Cartwright stated that my team's project was being cancelled due to "higher priorities". These higher priorities never materialized. This termination occurred at a vital time against a NIPF 1 target with strategic implications. Mr. Cartwright (my direct reporting senior) privately confessed that he had undermined the project to senior management while openly lauding my innate ability to solve the impossible.
>
> Due to recurring discrimination and provocation from Mr. Cartwright, it was suggested by Office level leadership that some separation from him would be beneficial. When a rotation to MARS as the Senior ST Officer was announced, I was selected over three other highly qualified candidates without an interview by the ST Director. The MARS program manager, Mr. Richard Gillin, upon learning of my technical and leadership credentials and nearly 20 years of operational experience, then appointed me to represent MARS to internal and external stakeholders.

Plaintiff further advised General Ashley:

The responses provided by Mr. Cartwright and Mr. Heathcock to the Reconsideration process included completely unsubstantiated attacks on my character and other falsified evidence. The PRA panel, chaired by an SES, noted that Mr. Cartwright had constructed an incident, involved people under his authority, and then went to a manager outside of DIA in order to falsify evidence, violating a protected communication in the process. The Reconsideration found in my favor to remove the language.

Mr. Cartwright's and Mr. Heathcock's actions certainly appear to have crossed into territory beyond civil law, in making false official claims, fabricating evidence, working together to do so, and sabotaging a unique and highly successful defense project. For reasons unknown, Mr. Cartwright and Mr. Heathcock appear to have deliberately fabricated a chain of false evidence and have continued attacks on my character in an effort to legitimize their negative comments in the appraisal process and use this as a basis to undermine my PAF.

Having exhausted all Agency modes of recourse I now report this to you. Mr. Cartwright's and Mr. Heathcock's actions in an official venue and the adverse impact upon an ongoing and unique Defense effort are, at best, deeply concerning and not in keeping with DIA core values.

Very Respectfully,
John C. Stewart
Senior Science and Technology Officer (SSTO) to the Machine-assisted Analytic Rapid-repository System (MARS)

66.    On May 14, 2020, General Ashley represented that he had discussed the matter with the DIA's Office of General Counsel, "and OIG will be in touch w/you."

67.    Defendants retaliated against Plaintiff.  Motivated by the desire to injure Plaintiff, and with knowledge of Plaintiff's whistleblower complaint, Defendants waged a brutal smear campaign against Plaintiff that continued for over two (2) years.  They ran an operation designed to undermine Plaintiff's character and professionalism, trigger his PTSD, and force him out of Government civil service.

### D.  Plaintiff Was Forced To Take Early Retirement

68.    Plaintiff had to retire fourteen and one-half years early because he would have gotten seriously sick from his assigned work responsibilities because of the ongoing discrimination and defamation campaign waged by Defendants.  Plaintiff's doctors thought the situation was an imminent threat to Plaintiff's life.

69.    Plaintiff retired early based of his disability.  He initiated the process. Akers, who knew about Plaintiff's disability when Plaintiff rotated to CIO, signed off on the paperwork.

70.    Plaintiff endured years of disability discrimination.  In addition to the incidents stated elsewhere in this Complaint, Cartwright mocked Plaintiff after he had foot surgery, had to use a scooter, and was advised by his physician not to climb stairs. Cartwright granted the staff "morale leave" to attend an event, but when Plaintiff got there, he found out he had to climb two flights of stairs.  When Plaintiff told Cartwright that he could not climb the stairs in his condition, Cartwright told Plaintiff that he had been warned about the event.  On the first day he was off the scooter, there was a fire drill and Plaintiff had to walk up a hill, supported by two of his co-workers, because he did not want to get in trouble for failing to be at the meeting point.  All the walking reinjured Plaintiff's foot and put him back on the scooter.  When Plaintiff filed for workman's compensation and put in the paperwork, Cartwright laughed at him.

71.    Cartwright refused to acknowledge Plaintiff's disability even after Plaintiff provided him with a doctor's letter containing Plaintiff's medical diagnosis. Plaintiff communicated with higher Leadership at DIA about Cartwright's discrimination, but Cartwright claimed that verbal communications did not happen because there was no record of it, so Plaintiff documented exchanges and kept everything in writing with Cartwright.  Cartwright attempted to trigger Plaintiff's disability on many occasions.  For instance, he inappropriately texted Plaintiff at 9:30 pm on a Friday evening to discuss the results of the 2021 PAF.  Cartwright confused facts to make them unverifiable.

Management's abusive treatment of Plaintiff worsened after the wine incident with Murphy and Plaintiff's complaint about Murphy's religious discrimination.

72.    As proof of Defendants' discrimination and retaliation against Plaintiff, Defendants gathered memos and records to attack Plaintiff's character and professionalism, but, significantly, failed to intervene, discipline, or remove Plaintiff from his position as a result of the alleged "behavioral" problems.

73.    Defendants' discrimination and false statements had a devasting impact on Plaintiff's health and employment, which is exceptionally well documented by the Veterans Administration as well as by medical professionals in private practice. For over a year, Plaintiff apprised his superiors of Defendants' misconduct, the impact of the defamation campaign, and the likely outcome, *e.g.*:

> The actions of these officers has also been very triggering for my injuries from active duty military service. If I should leave employment within DIA, the level and extremity of managerial abuse and violation of law will be the reason why.
>
> Lastly, my daily duties bear no resemblance to the kind of person whom management alleged I am. I am on a rotation and by Agency definition am a top performer.

The continuous abuse and constant predatory defamation by Cartwright, Murphy, Akers and Gayle ultimately caused Plaintiff's service-connected combat PTSD to become permanent and totally disabling. Plaintiff suffered sleep apnea, GERD, IBS, migraines, nightmares every single night, and more. Plaintiff lives in fear, waking or sleeping, that the Defendants will continue to find ways to hurt him. Plaintiff feels completely helpless and prostrate from the attacks. At all times relevant to this action, Defendants knew that the discrimination and defamation would trigger Plaintiff's PTSD. Defendants' actions took Plaintiff back to a mass grave in Kosovo looking at murdered civilians, who were brutally slain because they were of another creed and faith. Plaintiff feels that he is lying

next to the dead, all shot to hell by defamatory statements published by persons who relish every drop of blood they spill in full knowledge and belief that no one will ever hold them accountable.  Since retiring from DIA, Plaintiff has been offered lucrative positions, which he is unable to accept because of the deeply severe physical and psychological injuries caused by the Defendants' defamation, abuse and misconduct. Plaintiff's health has been permanently affected by the bureaucratic terror campaign inflicted upon him.  Plaintiff has lost friendships, professional associations and his career as a result of Defendants' misconduct.   Plaintiff did nothing to deserve the discrimination, defamation and infliction of harm.

### COUNT I – <u>HOSTILE WORK ENVIRONMENT/RETALIATION (TITLE VII)</u>

74.     Plaintiff restates paragraphs 1 through 73 of this Complaint, and incorporates them herein by reference.

75.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), prohibits DIA from discriminating on the basis of religion.  Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against" an employee for "oppos[ing] any practice" made unlawful by Title VII or having "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.

76.     At all times relevant to this action, Plaintiff was a member of a protected class of persons.  His job performance was more than satisfactory.

77.     DIA discriminated against Plaintiff on the basis of his religion in regard to his advancement, compensation, discharge, and other terms, conditions, and privileges of employment.

78.     DIA created and subjected Plaintiff to a hostile work environment because of Plaintiff's sincerely-held religious beliefs.    DIA subjected Plaintiff to unwelcome harassment because of Plaintiff's religious beliefs.  Plaintiff engaged in protected activity under Title VII.  DIA retaliated against Plaintiff when he complained about Murphy's discriminatory conduct, and Plaintiff suffered adverse action as a direct result of DIA's wrongful actions.

79.     Plaintiff's workplace was  permeated with discriminatory intimidation, ridicule and insult.  The harassment was sufficiently severe or pervasive so as to alter a term, condition, or privilege of employment, and create an abusive work environment. Plaintiff subjectively perceived his workplace environment was hostile, and a reasonable person would so perceive that it was objectively hostile, considering the frequency of the discriminatory conduct; its severity; the threatening and humiliating nature of the misconduct; and the fact that it unreasonably interfered with Plaintiff's work performance.

80.     As a direct result of DIA's discrimination, Plaintiff suffered damage and incurred loss, including, but not limited to, loss of past and future earnings and benefits, compensatory and punitive damages, attorney's fees under 42 U.S.C. § 1988(b), and costs incurred.

**COUNT II – <u>HOSTILE WORK ENVIRONMENT UNDER THE ADA</u>**

81.     Plaintiff restates paragraphs 1 through 80 of this Complaint, and incorporates them herein by reference.

82.     Between January 2019 and June 2021, DIA violated §§ 12112(a-b) and 12201(d) of the ADA.  DIA discriminated against Plaintiff on the basis of disability in

regard to his advancement, compensation, discharge, and other terms, conditions, and privileges of employment.

83.    DIA created and subjected Plaintiff to a hostile work environment.

84.    At all times relevant to this action, Plaintiff was a qualified individual with a disability.  His job performance was more than satisfactory.

85.    Plaintiff was repeatedly subjected to unwelcome harassment based on his disability.

86.    The harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment, and force him to retire.  Plaintiff subjectively perceived his workplace environment was hostile, and a reasonable person would so perceive that it was objectively hostile, considering the frequency of the discriminatory conduct; its severity; the threatening and humiliating nature of the misconduct; and the fact that it unreasonably interfered with Plaintiff's work performance.  Plaintiff's supervisors constantly berated and harassed him.  The harassment occurred repeatedly over years.

87.    As a direct result of DIA's discrimination, Plaintiff suffered damage and incurred loss, including, but not limited to, loss of past and future earnings and benefits, compensatory and punitive damages, attorney's fees under 42 U.S.C. §§ 1988(b) and 12205, and costs incurred.

**COUNT III – <u>DISPARATE TREATMENT UNDER THE ADA</u>**

88.    Plaintiff restates paragraphs 1 through 87 of this Complaint, and incorporates them herein by reference.

89.     Plaintiff has an actual disability and is a qualified individual under the ADA.

90.     DIA took an adverse employment action against Plaintiff because of his disability.  Plaintiff suffered a significant change in his employment status because of his disability.

91.     As a direct result of DIA's disparate treatment under the ADA, Plaintiff suffered damage and incurred loss, including, but not limited to, loss of past and future earnings and benefits, compensatory and punitive damages, attorney's fees under 42 U.S.C. §§ 1988(b) and 12205, and costs incurred.

### COUNT IV – <u>RETALIATION UNDER THE ADA</u>

92.     Plaintiff restates paragraphs 1 through 91 of this Complaint, and incorporates them herein by reference.

93.     Plaintiff engaged in protected conduct by complaining to DIA about the misconduct by Cartwright, Murphy, Akers and Gayle.

94.     DIA took an adverse employment action against Plaintiff because of his complaints.  DIA's action was materially adverse and it dissuaded Plaintiff from pursuing or supporting a charge of discrimination.

95.     As a direct result of DIA's retaliation in violation of § 12203(a-b) of the ADA, Plaintiff suffered damage and incurred loss, including, but not limited to, loss of past and future earnings and benefits, compensatory and punitive damages, attorney's fees under 42 U.S.C. §§ 1988(b) and 12205, and costs incurred.

## COUNT V – <u>DEFAMATION</u>

96.    Plaintiff restates paragraphs 1 through 95 of this Complaint, and incorporates them herein by reference.[8]

97.    Within the past year, Cartwright, Murphy, Akers and Gayle made and published among themselves and to third-parties false factual statements, which are detailed verbatim above, of or concerning Plaintiff.   Defendants published the false statements via email, telephonically, in person and by other means known to Defendants. Defendants made and published the false statements without privilege of any kind.

98.    Defendants' false statements constitute defamation *per se*.  The statements accuse and impute to Plaintiff the commission of crimes involving moral turpitude and for which he may be punished and imprisoned in a state or federal institution.   The statements impute an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of the duties of such office or employment, including dishonesty, unethical practices and lack of integrity.  Defendants' statements also prejudice Plaintiff in his profession or trade as an intelligence officer.

99.    Plaintiff is a private individual.   Defendants' false statements do not involve a matter of public concern.   Defendants' false statements caused Plaintiff to suffer presumed and actual damages, including, but not limited to, loss of income and injury to business, insult, pain, embarrassment, humiliation, and mental suffering, injury to name and reputation, and out-of-pocket loss.

---

[8]    Counts V-IX are alleged in the alternative.   Cartwright, Murphy, Akers and Gayle's actions were outside the scope of their employment with DIA.   Their misconduct (described above) was not fairly and/or naturally incident to the mission, vision, values or business of DIA or done with a view to further DIA's interests.   Rather, their misconduct clearly arose wholly from an external, independent, and personal motive on their part to hurt Plaintiff.

100.    Defendants made the false statements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false. Defendants acted with actual malice and reckless disregard for the truth for the following reasons:

a.    Defendants had a motive to lie and a motive to fabricate the false statements.  Defendants were out to get Plaintiff, and engaged in an operation to harm Plaintiff, trigger his PTSD and force him out of DIA.

b.    Defendants knew the statements were false.  They fabricated the statements out of whole cloth.  The statements were knowingly false, with not a shred of supporting evidence.  Indeed, most of the false statements were contradicted by evidence known to Defendants and in their possession prior to publication.

c.    Defendants chose to use unnecessarily strong and violent language, disproportionate to the occasion.

d.    Defendants did not act in good faith because, in the total absence of evidence, they could not have had an honest belief in the truth of their statements about Plaintiff.

e.    Defendants initiated the defamation, and went out of their way to publish extra-judicial statements about Plaintiff.  As part of the operation, Defendants Cartwright, Murphy and Akers republished the false and defamatory statements after being notified by Plaintiff and others, including Johnny Sawyer, that their statements were false. *Nunes v. Lizza*, 12 F. 4th 890, 901 (8th Cir. 2021) ("'Republication of a statement after the defendant has been notified that the

plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard.' Restatement (Second) of Torts § 580A cmt. d (Am. L. Inst. 1977). Lizza tweeted the article in November 2019 after Nunes filed this lawsuit and denied the article's implication. The pleaded facts are suggestive enough to render it plausible that Lizza, at that point, engaged in 'the purposeful avoidance of the truth.'").

101.    Defendants lacked reasonable grounds for any belief in the truth of their statements and acted negligently in failing to determine the true facts.

102.    As a direct result of Defendants' defamation, Plaintiff suffered presumed damages and actual damages, including, but not limited to, loss of income and injury to business, insult, pain, humiliation, embarrassment, mental suffering, permanent damage and injury to his personal and professional reputations, attorney's fees, costs, and other out-of-pocket expenses.

### COUNT VI – <u>INSULTING WORDS</u>

103.    Plaintiff restates paragraphs 1 through 102 of this Complaint, and incorporates them herein by reference.

104.    Defendants' insulting words, in the context and under the circumstances in which they were spoken and written, tend to violence and breach of the peace. Like any reasonable person, Plaintiff was humiliated, disgusted, angered and provoked by the insulting words.

105.    Defendants' words are fighting words, which are actionable under § 8.01-45 of the Virginia Code (1950), as amended.

106.    As a direct result of Defendants' insulting words, Plaintiff suffered presumed damages and actual damages, including, but not limited to, loss of income and injury to business, insult, pain, humiliation, embarrassment, mental suffering, permanent damage and injury to his personal and professional reputations, attorney's fees, costs, and other out-of-pocket expenses.

### COUNT VII – <u>TORTIOUS INTERFERENCE WITH CONTRACT</u>

107.    Plaintiff restates paragraphs 1 through 106 of this Complaint, and incorporates them herein by reference.

108.    In 2021, Plaintiff had a valid contract and reasonable business expectations in, to and under his employment contract with DIA.  His contract was not terminable at will.  Plaintiff's employment agreement entitled him to payment for services rendered, benefits, the possibility of future advancement, and the reasonable expectation of continued performance given Plaintiff's stellar accomplishments.

109.    Each Defendant knew that Plaintiff was employed by DIA.  By reason of their positions and interactions with Plaintiff, each Defendant also knew about Plaintiff's contract and business expectations.

110.    Prior to June 8, 2021, Defendants each intentionally interfered with Plaintiff's employment contract with DIA by, *inter alia*, publishing false and defamatory statements about Plaintiff.  In addition to intentional interference, Defendants employed improper methods of interference, including actions and practices that were, *inter alia*, independently actionable, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, and sharp.

111.    As a direct result of Defendants' intentional and tortious interference, Plaintiff suffered damage and incurred loss, including, but not limited to, loss of business and income, lost future earnings and diminished earning capacity, insult, humiliation, embarrassment, pain and mental suffering, injury to his reputation, court costs, and other out-of-pocket expenses.

### COUNT VIII – <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

112.    Plaintiff restates paragraphs 1 through 111 of this Complaint, and incorporates them herein by reference.

113.    Defendants' conduct, detailed above, was intentional and/or reckless, concerted, criminal and deliberately violative of Virginia law.  Defendants engaged in a series of acts that, taken together, constitute extreme and outrageous behavior. Defendants purposefully initiated an operation to harm Plaintiff and destroy his reputation.  In spite of their actual knowledge, Defendants engaged in a planned operation to ruin Plaintiff emotionally, physically and financially.  Defendants' conduct was flagrant and heartless.

114.    Defendants' actions offend against generally accepted standards of decency and morality.  Defendants knew about Plaintiff's PTSD and intentionally sought to trigger Plaintiff.  Defendants' actions are atrocious and utterly intolerable. *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122-123 (2nd Cir. 2019) (plaintiffs stated a claim of intentional infliction of emotional distress, where, taken together, the defendants' acts "might amount to a deliberate and malicious campaign of harassment" and where, alternatively, plaintiffs alleged that the defendants knew of plaintiff's susceptibility to emotional distress and "chose to proceed with their plan in spite of that knowledge").

115.    Defendants' outrageous conduct caused Plaintiff to suffer severe emotional distress, post-traumatic stress, flashbacks, and extreme fear, including fear of death.

116.    Defendants' misconduct constitutes intentional infliction of emotional distress.

117.    As a direct result of Defendants' intentional infliction of emotional distress, Plaintiff suffered actual damages and special damages, including, but not limited to, loss of income and injury to business, insult, pain, humiliation, embarrassment, mental suffering and injury to reputation, and other out-of-pocket expenses.

## COUNT IX – <u>CONSPIRACY</u>

118.    Plaintiff restates paragraphs 1 through 117 of this Complaint, and incorporates them herein by reference.

119.    Beginning in January 2019 and continuing through September 2021, Defendants combined, associated, agreed or acted in concert together and with others at DIA, for the express purpose of injuring Plaintiff through, *inter alia*, the publication and republication of false and defamatory statements and through tortious interference with Plaintiff's employment.  In furtherance of the conspiracy and preconceived joint plan, Defendants orchestrated a scheme the unlawful purpose of which was to defame and persecute Plaintiff for conduct that never occurred.

120.    Defendants acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were injuring Plaintiff.

121.   Defendants' actions constitute a common law conspiracy to defame and to tortiously interfere with contract, and a conspiracy to deprive Plaintiff of the privileges and benefits granted to Plaintiff under the Constitution and Federal law.

122.   As a direct result of Defendants' conspiracy, Plaintiff suffered actual damages and special damages, including, but not limited to, loss of income and business injury, insult, pain, humiliation, embarrassment, mental suffering and injury to reputation, and other out-of-pocket expenses.

Plaintiff alleges the foregoing based upon personal knowledge, public statements of others, and records in her possession.   She believes that substantial additional evidentiary support, which is in the exclusive possession of the Defendants, their clients, agents, surrogates, alter egos, and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Plaintiff reserves the right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Plaintiff, John Stewart, respectfully request the Court to enter Judgment against Defendants, jointly and severally, as follows:

A.   Compensatory damages in the amount of $10,000,000.00 or such greater amount as is determined by the Jury;

B.   Punitive damages in the amount of $350,000.00 or the maximum amount allowed by law;

C.      Prejudgment interest at the rate of 6% per year on the Principal Sum awarded by the Jury from May 13, 2022 to the date of Judgment;

D.      Postjudgment interest at the rate of six percent (6%) per annum until paid;

E.      Attorney's Fees;

F.      Expert Witness Fees;

G.      Such other relief as is just and proper.

**TRIAL BY JURY IS DEMANDED**

DATED:      August 1, 2022

JOHN STEWART

By:    */s/ Steven S. Biss*
            Steven S. Biss (VSB # 32972)
            300 West Main Street, Suite 102
            Charlottesville, Virginia 22903
            Telephone:  (804) 501-8272
            Facsimile:  (202) 318-4098
            Email:  stevenbiss@earthlink.net

            *Counsel for the Plaintiff*