**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | |
|---|---|
| **JOHN STEWART**, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No.: 3:22-cv-43 |
| | : |
| **LLOYD J. AUSTIN, III, and UNITED STATES** | : |
| **OF AMERICA**, | : |
| | : **TRIAL BY JURY DEMANDED** |
| Defendants. | : |
| | : |

**FIRST AMENDED COMPLAINT[1]**

COMES NOW, Plaintiff, John Stewart ("Plaintiff"), by and through his undersigned
counsel, and moves this Honorable Court for judgment against Defendants' Defense Secretary,
Lloyd J. Austin, III, in his official capacity ("Austin"), and the United States of America[2] ("US";
Austin and US, collectively, "Defendants"), on the grounds and praying for the relief hereinafter
set forth:

**The Parties**

1. Plaintiff is an individual who resides in Fluvanna County in the Commonwealth of
Virginia and is a former, federal employee of the Department of Defense ("DoD") and its
principal, the Defense Intelligence Agency ("DIA").

---

[1] Plaintiff files this First Amended Complaint pursuant to Rule 15(a)(1)(B) in response to
Defendants' Motion to Dismiss [DE 73] filed on December 23, 2024.

[2] On November 7, 2024, the US moved to substitute the United States of America as a party for
Theodor Cartwright, Rhett Murphy, Frank Tyler Akers, Jr., and Elizabeth Gale [DE 71], which
the Court subsequently granted on November 13, 2024 [DE 72].

2.   Defendant Austin is the 28th Secretary of Defense for the US.  He is named as a

Defendant in his official capacity [https://www.defense.gov/About/Secretary-of-Defense].

3.   Defendant US is a substituted party in place of US federal employees' Theodor

Cartwright ("Cartwright"), Rhett Murphy ("Murphy"), Frank Tyler Akers, Jr. ("Akers"), and

Elizabeth Gale ("Gale"; collectively, "Defendant Employees").

## Jurisdiction and Venue

4.   This action arises against Defendants based on allegations of illegal retaliation, hostile

work environment, and constructive discharge pursuant to Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e, et *seq*. ("Title VII"), and the Rehabilitation Act of 1973, 29 U.S.C. § 791, et

*seq.* ("Rehab Act"), as applicable. This Court has subject-matter jurisdiction over this action

pursuant to 28 U.S.C. § 1331 as a federal question exists.

5.   This Court has *in personam* jurisdiction over Defendants in this action pursuant to Fed.

R. Civ. P. 4(i) and 4(k), and Fed. R. Civ. P. 12(h)(1).

6.   Venue is proper in the Western District of Virginia, Charlottesville Division, pursuant to 28

U.S.C. § 1391(b)(2), and L. Civ. R. 2 (a)(2), because a substantial part of the events or omissions

giving rise to the claims set forth in this First Amended Complaint occurred in this judicial District.

## Exhaustion of Administrative Remedies

7.   Plaintiff has duly exhausted his administrative remedies as to all claims complained of

herein. On June 1, 2021, Plaintiff filed a formal individual complaint of discrimination based on

the allegations complained of herein as to his deeply-held, religious beliefs and as to his

disability. DIA investigated the complaint from July 19, 2021 through November 9, 2021, and on

November 26, 2021, Plaintiff received a copy of the Results of Investigation (ROI). On March

17, 2022, Plaintiff requested a Final Agency Decision (FAD) on his complaint. On May 13,

2022, DIA issued its FAD. This action, originally filed on August 1, 2022, was timely filed

within 90 days of Plaintiff's receipt of the FAD in accordance with 42 U.S.C. § 2000e-16(c) and

29 C.F.R. § 1614.407(a).

## STATEMENT OF FACTS

8. Plaintiff, a devout Catholic ("Religion"), is deeply religious with sincere religious beliefs.

9. Plaintiff is also a disabled combat veteran who suffers, and at all relevant times herein has

suffered, from post-traumatic stress disorder ("Disability").

10. Plaintiff's symptoms associated with his Disability, including from 2019 through 2021,

include flashbacks, sleep apnea, GERD, IBS, migraines, nightly nightmares, insomnia, stress,

paranoia and anxiety/panic attacks ("Disability Symptoms").

11. Plaintiff's Disability Symptoms occur periodically, and can be  triggered by others yelling

at, berating, or threatening to assault him.

12. Plaintiff's Disability Symptoms, periodically, substantially limit his brain function, day-to-

day activities, sleeping, and work activities.

13. At all times relevant to this action, Plaintiff could perform the essential functions of his

employment position. Consequently, Plaintiff is a qualified individual under the Rehab Act with

mental and physical impairments that substantially limit one or more of his major life activities.

14. Defendants, at all relevant time herein, including through Defendant Employees, had actual

knowledge of Plaintiff's Religion and Disability.

15. Between 2019 through 2021, Defendants, through Defendant Employees, engaged in years of misconduct for the sole purpose of triggering Plaintiff's Disability, destabilizing Plaintiff and forcing him from Government service.

16. As senior, career United States intelligence officers familiar with military intelligence operations, active measures and disinformation techniques, Defendant Employees used classified government systems of a global intelligence agency to target Plaintiff and perpetrate a disinformation operation. At all relevant times, these Defendant Employees knew that their ruthless, outrageous, severe and pervasive actions would harm Plaintiff.

**Plaintiff's Applicable Deployment and Employment History**

17. Plaintiff graduated from Wright State University ("WSU") with a Bachelor of Science in Electrical Engineering. He also earned a Master of Arts in International Relations from WSU.

18. Between 1997 and 2001, Plaintiff served as a Commissioned Officer in the United States Army Signal Corps. He deployed to Kosovo and Macedonia, where he witnessed unimaginable atrocity that eventually led to his Disability.

19. Between 2004 and 2014, Plaintiff served in various capacities as an intelligence officer and DoD engineer.

20. In 2014, Plaintiff accepted a position with DIA[3], located at Rivanna Station in Charlottesville, Virginia.

21. Between 2014 and 2021, Plaintiff worked for DIA in the Office of Defense Technology and Long-Range Analysis as a Scientific and Technical Intelligence ("S&TI") analyst for over-

---

[3] DIA is the principal advisor to the Secretary of Defense and Joint Chiefs of Staff on matters of military intelligence. [https://www.dia.mil/About/].

the-horizon and novel technologies (2014-2017); as a team lead in the Office of Advanced Technologies Intelligence ("ATI"), Technical Targeting Branch ("TTB"), for multi-national, multiagency, and Combatant Command Communities of Interest against foreign hard targets (2017-2019); in the Science and Technology ("ST") Directorate, as Senior Science and Technology Officer ("SSTO") to the Machine-assisted Analytic Rapid-repository System ("MARS") responsible for R&D solutions (2019-2020); and in the ST Directorate as lead action officer for development and implementation of cloud technology as archetype for the entire U.S. Intelligence Community ("IC") and DoD (2020-2021).

22. Plaintiff has a Top Secret/SCI w/CI Poly security clearance Plaintiff and was an intelligence officer, GG-13.

23. Plaintiff served his Country and DIA extremely well. Plaintiff's work performance was consistently excellent. His career was distinguished by honor, singular dedication, trust, integrity and service to DIA at the very highest level. His honesty, integrity, ethics, and reputation for truthfulness and veracity were integral to his success as an intelligence officer.

24. He was praised by superiors for his knack in getting disparate persons unified in the same direction on a target. Office Chief Michael Cleary observed that Plaintiff possessed the unique ability to galvanize multiagency and multinational teams.

25. Plaintiff served in a visible leadership role that materially impacted bringing DIA into the cloud computing environment, was the point lead to secure data for storage and movement, never received any negative counseling, and was selected to go on rotation as ST representative to MARS over other highly competitive candidates.

26. Nevertheless, based on the actions identified herein by Defendant Employees, Plaintiff was constructively discharged and forced into retirement in June 2021, roughly fifteen (15) years earlier than he would have otherwise retired. Plaintiff is now a farmer. He grows crops and livestock with his wife and five (5) children in Fluvanna County on a much diminished income, scarred for life by Defendants' lies and machinations that destroyed his health and career.

### Genesis in Motive for Discriminatory Actions

27. In January 2019, Cartwright issued Plaintiff a Letter of Reprimand ("LOR") because of Plaintiff's interactions with Murphy (described below) and after Plaintiff confronted Cartwright for manipulating the Talent Management System ("TMS") to promote Gayle, who had no real experience, qualifications, education or aptitude. Cartwright misrepresented that he had been ordered to issue the LOR.

28. From this point forward, in spite of his top performance, Defendant Employees singled out Plaintiff; subjected him to a hostile work environment based on his Religion and Disability (with associated rhetoric attributable thereto); treated him with aggression and contempt; yelled at him on the phone; told him he was a problem; attacked him on his Personal Action Form ("PAF"); and ruined any opportunity he had for promotion in mid-2021. These actions triggered Plaintiff's Disability Symptoms for a Disability actually known by Defendants and Defendant Employees.

29. As part of the ongoing disinformation operation against Plaintiff, Defendant Employees mimicked and repeated each other in order (a technique known as '***astroturfing***') to make it appear that there were multiple corroborating sources and organic support for each other in order to amplify the false narratives. This concerted effort was made by Defendant Employees in an attempt to force Plaintiff to resign.

6

**Plaintiff's 2020 Complaint**

30. On May 14, 2020, Plaintiff filed a complaint against, *inter alia*, Cartwright, based on discrimination associated with his Religion and Disability with then Director of DIA, General Robert P. Ashley, Jr. ("General Ashley"), stating:

> I am currently on an internal rotation as the ST representative to the MARS program. Under my permanent ST managers, Mr. Theodor Cartwright (ATI-5A Branch Chief) and Mr. Robert Heathcock (ATI-5 Division Chief), I have experienced religious and disability discrimination, false official statements in a formal proceeding, falsification of evidence, and work sabotage that possibly exceeds $1-million in cost to the U.S. taxpayer. Witnesses and documentation pursuant to this were provided to the OIG approximately six months ago.
>
> Regarding the work and personal sabotage, I have briefed the project in question to you in person twice. The end use customer articulated that ours was the only IC element to perform such work. Mr. Heathcock forwarded that to the Office level as evidence of community impact. Our team was requested by ODNI as a plenary keynote presentation at a multinational counterproliferation conference, which Allied nations described the work as "intelligible, unprecedented, and repeatable". Allied elements reached out for future collaboration. Mr. Cartwright stated that my team's project was being cancelled due to "higher priorities". These higher priorities never materialized. This termination occurred at a vital time against a NIPF 1 target with strategic implications. Mr. Cartwright (my direct reporting senior) privately confessed that he had undermined the project to senior management while openly lauding my innate ability to solve the impossible.
>
> Due to recurring discrimination and provocation from Mr. Cartwright, it was suggested by Office level leadership that some separation from him would be beneficial. When a rotation to MARS as the Senior ST Officer was announced, I was selected over three other highly qualified candidates without an interview by the ST Director. The MARS program manager, Mr. Richard Gillin, upon learning of my technical and leadership credentials and nearly 20 years of operational experience, then appointed me to represent MARS to internal and external stakeholders.

> The responses provided by Mr. Cartwright and Mr. Heathcock to the Reconsideration process included completely unsubstantiated attacks on my character and other falsified evidence. The PRA panel, chaired by an SES, noted that Mr. Cartwright had constructed an incident, involved people under his authority, and then went to a manager outside of DIA in order to falsify evidence, violating a protected communication in the process. The Reconsideration found in my favor to remove the language.
>
> Mr. Cartwright's and Mr. Heathcock's actions certainly appear to have crossed into territory beyond civil law, in making false official claims, fabricating evidence, working together to do so, and sabotaging a unique and highly successful defense project. For reasons unknown, Mr. Cartwright and Mr. Heathcock appear to have deliberately fabricated a chain of false evidence and have continued attacks on my character in an effort to legitimize their negative comments in the appraisal process and use this as a basis to undermine my PAF.
>
> Having exhausted all Agency modes of recourse I now report this to you. Mr. Cartwright's and Mr. Heathcock's actions in an official venue and the adverse impact upon an ongoing and unique Defense effort are, at best, deeply concerning and not in keeping with DIA core values.
>
> Very Respectfully,
> John C. Stewart
> Senior Science and Technology Officer (SSTO) to the Machine-assisted Analytic Rapid-repository System (MARS)

31. On May 14, 2020, General Ashley represented that he had discussed the matter with the DIA's Office of General Counsel, "and OIG will be in touch w/you."

32. Defendants retaliated against Plaintiff through Defendant Employees, especially Cartwright, who was now motivated more than ever. With knowledge of Plaintiff's complaint, Defendant Employees, led by Cartwright, ran an operation designed to undermine Plaintiff's character and professionalism, trigger his Disability Symptoms, and force him out of Government civil service. Defendant Employees were successful. Plaintiff was constructively discharged in June 2021.

### <u>Discrimination, Hostile Work Environment & Retaliation by Murphy<br>(Religion-based)</u>

33. At all times relevant hereto, Murphy was Deputy Division Chief then Division Chief of ATI-5, and Plaintiff's supervisor.

34. From October 2018 through and up to Plaintiff's constructive discharge in June 2021, Murphy, as a Protestant who had express disdain for Plaintiff's Religion, repeatedly abused Plaintiff because of Plaintiff's Religion.

35. Murphy repeatedly lectured Plaintiff about the Catholics in Northern Ireland, implying that Plaintiff, as a practicing Catholic, held beliefs and prejudices against Irish Protestants, the latter Murphy's religion.

36. Murphy's bigotry was very offensive and his relentless focus on Plaintiff's religion was completely unrelated to the work Plaintiff performed for DIA.

37. By way of example, Murphy knowingly modified his duty uniform in a manner that was expressly offensive and hateful to Plaintiff's Religion; specifically, Murphy had bright orange boot

blousers stitched into his uniform, and told Plaintiff he needed to have his "protestant orange" in the "Catholic green" uniform Murphy was forced to wear.

38. Murphy attempted to lecture Plaintiff on the meaning of orange in Northern Ireland. Murphy knew that Plaintiff spoke fluent Irish Gaelic and spent significant portions of his life in Northern Ireland. Plaintiff responded that not only did he know exactly what orange means in Ulster but that he had done his master's degree project/thesis on the topic based on first-hand experience.

39. The color orange is associated with the Orange Order, a Protestant fraternal society in Ulster, Ireland, that has historically opposed Catholicism. The Orange Order's name comes from William of Orange, a Protestant king who defeated Catholic King James II in the 1680s.

40. Plaintiff informed Cartwright of the incident, but nothing followed. Murphy was very open of his mockery and would point to his orange bracers and laugh, knowing, like Cartwright, that accountability would never occur.

41. By way of further example, Murphy fabricated an alleged conversation with Plaintiff stating that Plaintiff had said that DIA was not a safe workspace for Catholics, thus continuing the religious discrimination and hostile work environment.

42. By way of further example, Murphy, along with Cartwright, Akers, and Gayle, falsely stated that Plaintiff was repeatedly abusive towards female employees. Murphy stated that Plaintiff was abusive toward female employees ***because he was Catholic***. Murphy deliberately made Plaintiff appear sexist, demeaning, bigoted, unprofessional and unstable. These allegations by Defendant Employees were never substantiated and were objectively false.

43. As a matter of order and discipline, had Plaintiff behaved in the manner described by Murphy and Defendant Employees, DIA would have suspended his clearances and accesses pending an investigation.  No investigation occurred.  Plaintiff was never counseled or interviewed by anyone because, in truth, he was never abusive towards any female employee of DIA. Indeed, DIA decided to remove the derogatory information about "abusive behavior" from Plaintiff's record because it was abjectly false. Murphy, however, could not stand that he had been caught:

> Will removing the derogatory information be accompanied by his stopping to degrade women's achievements? Will there be an accompanying restoration of reputation for the targets of John's malicious lies? (there are several.)
>
> Rhett B. Murphy, Lt Col, USAF
> Deputy Chief - Targeting, Engineering, and Test Division (ATI5)
> Office of Advanced Technologies Intelligence (ATI)
> Directorate for Science & Technology (ST)
> Defense Intelligence Agency (DIA)
> Charlottesville – 1088D
> TSVOIP – 982.4370
> Secure VTC – 912-2902
> Comm - 434-995-4307
> (JWICS) – Rhett.B.Murphy@coe.ic.gov
> (SIPR) – rhett.murphy @dia.smil.mil
> (NIPR) – rhett.murphy @dodiis.mil

44. By way of further example, on a Holy Monday in the Catholic calendar, Murphy, who had actual knowledge of Plaintiff's Religion, attempted to give Plaintiff a bottle of wine.

45. When Plaintiff reminded Murphy it was a ***Holy Monday*** for Plaintiff, Murphy sarcastically responded that he figured Plaintiff would "appreciate having the wine on ***Holy Thursday*** for the Seder meal, as part of Jewish Passover". Plaintiff reminded Murphy that the Pope had decreed Catholics not to perform the Jewish Seder Meal, which Murphy was apparently aware of.

46. When Plaintiff repeated that he did not want the bottle of wine, Murphy stood up and came face-to-face with Plaintiff (who was still seated), grinned, advised Plaintiff that he would take the

bottle out of the secured workspace because he had "smuggled it in", and chuckled as he walked away.

47. When Plaintiff reported Murphy's discrimination of Plaintiff as to his Religion regarding the wine incident to Cartwright, Cartwright claimed it was "incredulous" and then burst out laughing.

48. Cartwright then proceeded to put on an inquisition as to Plaintiff's religious beliefs and laughed raucously upon each response by Plaintiff. It was shocking to Plaintiff to the point it caused physical discomfort and was deeply triggering of his Disability Symptoms.

49. Later, when Murphy was interviewed about this incident, he claimed that it was not wine at all but "consecrated sacramental wine", which would make it the Most Holy Eucharist. As Murphy was aware when making such an antagonizing statement, had his words been true, this would mean that this wine would have been stolen from a Catholic church after the Act of Consecration at the Holy Sacrifice of the Mass. This sin is so exceptionally egregious that in the Catholic faith, the sin of desecration of the Eucharist may only be forgiven by the Holy Father, The Pope, himself.

50. Plaintiff's Religion believes that the Eucharist is the literal body, blood, soul, and divinity of Jesus Christ, Our Lord.

51. When Plaintiff learned that Murphy had gone so egregiously low in order to invent a technicality to avoid penalty, Plaintiff went to his parish priest and to the bishop. Plaintiff was reduced to bitter tears. The obscenity was so severe as to Plaintiff that he equated to a physically and theologically equal to those who personally nailed Christ to the cross.

52. After engaging in protected activity and reporting Murphy to Cartwright, Murphy retaliated against Plaintiff in connection with making fabricated, poor reviews of Plaintiff's job performance; specifically, Murphy falsely represented that Plaintiff failed to meet the very minimal qualifications to be a GG-14; that Plaintiff had extreme difficulty working with different people; that Plaintiff had extreme difficulty communicating any kind of disagreements or difference of opinions with a variety of personality types and ranks; that Plaintiff was caustic; and that he caused a lot of disruption at work. Such false and retaliatory comments by Murphy ultimately led to Plaintiff not receiving in a promotion in May 2021 and his constructive discharge in June 2021.

53. No formal action of any kind was taken against Murphy despite Plaintiff's repeated complaints as to the hostile work environment created by Murphy, his discrimination of Plaintiff, and retaliatory conduct toward Plaintiff, all based on Plaintiff's Religion.

54. Murphy continued to harass Plaintiff up until Plaintiff's constructive discharge in June 2021 by continuously expressing that he had problems with the Catholic theology (Plaintiff's Religion) and moral teachings.

### Discrimination, Hostile Work Environment & Retaliation by Akers (Disability-based)

55. At all times relevant to this action, Akers was the CIO Branch Chief, Plaintiff's rotational supervisor and rater, although Cartwright and Murphy were the official authors in the HR system.

56. As Plaintiff's supervisor, Akers had actual knowledge of a reasonable accommodation that had been provided by DIA to Plaintiff in connection with his Disability; specifically, DIA had provided Plaintiff with a reasonable accommodation to work four (4), ten (10)-hour days to give him the flexibility to attend regular, Friday medical follow-ups for his Disability. Consequently,

Akers had actual knowledge of Plaintiff's Disability. Upon suspicion, Cartwright further disclosed or otherwise confirmed Plaintiff's Disability and Plaintiff's Disability Symptoms to Akers.

57. Akers never brought up any issues with Plaintiff's performance until Akers was contacted by Cartwright. Cartwright solicited derogatory information about Plaintiff and a derogatory rating so as not to promote Plaintiff in mid-2021.

58. Akers believed that because of Plaintiff's Disability he was unable to advance professionally and was ineligible for a promotion. Akers informed Plaintiff that his (Akers') input needed to be consistent with Plaintiff's Disability and his suitability for promotion and medical condition. Contrary to Akers' discriminatory statement, Plaintiff's suitability for promotion and his Disability were not connected.

59. Akers made the false statements and gave a negative rating of Plaintiff because of Plaintiff's Disability and Disability Symptoms, the latter which were triggered by actions of Defendant Employees.

60. By way of example, in or around March 2021, Akers falsely stated that Plaintiff had work performance issues at CIO. Akers parroted the false statement that Plaintiff was having trouble establishing relationships with certain members of USDI and certain people within CIO, as described more fully below. These statements, as discussed below, were materially false.

61. By way of further example, Akers falsely claimed that Plaintiff stated that his supervisors in the MARS program, John Dailey ("Dailey") and Joy Bernardo ("Bernado"), did not like him. Conversely, neither Dailey nor Bernardo ever gave Plaintiff any negative feedback or counseling. Bernardo was not even in Plaintiff's rating chain. Plaintiff never once had an individual conversation with her. In reality, while at CIO, Plaintiff took all direction from DIA CIO Defense

Intelligence Senior Level ("DISL") officer, Mac Townsend ("Townsend").  Akers made no effort to contact Townsend because Akers knew that Townsend would not support the false narrative drummed up by Cartwright and Akers.

62. Akers initially admitted that he never counseled Plaintiff about any performance issues, and, indeed, there is not a single counseling statement prepared by Akers.  Akers could not provide any specific support for his false statements because he knew none existed.  Akers had no evidence related to Plaintiff's professionalism, bearing, work ethic, day-to-day attitude, personal and professional integrity, etc.  He simply levelled generic and baseless accusations, hoping that his management position would somehow provide the missing credibility.

63. By way of further example, Akers stated or implied that the Common Data Fabric ("CDF") project got moved because of Plaintiff. Akers' statements about CDF were materially misleading. The CDF project was put on the back-burner, but not because of anything Plaintiff did or did not do.

64. By way of further example, Akers brought up Plaintiff's working relationship with Emily Cwengros ("Cwengros"). Akers falsely represented that Cwengros said to him that she would quit if she was forced to work with Plaintiff. Cwengros was on both teams that Plaintiff lead at CIO. She did a superb job.  There were no issues between Plaintiff and Cwengros. Plaintiff and Cwengros were personal friends, especially communications outside working hours. She never quit and never expressed any interest in doing so. Plaintiff asked Akers point blank:  if Cwengros' statement was true and accurate, "why am I leading the development of a key requirements document for the DIA Data Hub (DDH) effort as well as lead coordinator for the communications campaign for DDH?"  Akers did not respond.

65. By way of further example, Akers also falsely claimed that Ted Brunjes ("Brunjes") would corroborate Akers' false accusations of performance issues.  Brunjes reached out to Plaintiff via MS Teams.

66. In a telephonic conversation that followed, Brunjes advised Plaintiff that he had relieved the team lead for the Functional Requirements Document ("FRD") for the DIA DDH.  Brunjes appointed Plaintiff as the new team lead immediately to get the project across the finish line.  The DDH FRD was intended to serve as a template for the entire IC. Plaintiff and his team made incredible progress and were regularly lauded by the Senior Technical Advisor to CIO Engineering.

67. Plaintiff's other duty at CIO was the team lead to plan the public affairs (communications plan) for DDH.  This assignment, which also came from Brunjes, would have been a particularly bad fit for someone with "performance issues" or "behavioral issues".  Akers' statements about Plaintiff's job performance were knowingly false and were belied by the fact that Plaintiff was assigned increasingly important job responsibilities, and was a top performer according to every matrix.

68. Plaintiff and Akers met via MS Teams, and Akers asserted that Cartwright had "exaggerated" what he had been told by Akers.

69. Following this conversation, Plaintiff had a call with Akers' Branch Chief Michael J. McCabe ("McCabe"). McCabe told Plaintiff that he and Akers actually recommended Plaintiff for a "P" – promotion – in his PAF.  McCabe told Plaintiff that he wanted to retain Plaintiff in CIO because Plaintiff's work was good. It seemed apparent that McCabe was clearly covering for Akers at this point given that he had discriminated against Plaintiff on the basis of his Disability.

## Discrimination, Hostile Work Environment & Retaliation by Gayle
## (Disability-based)

70. At all times relevant to this action, Gayle was Senior Technical Targeter, a newly formed position, and Plaintiff's quasi-supervisor.

71. Upon suspicion, Cartwright had disseminated to Gayle Plaintiff's Disability and his Disability Symptoms.

72. In furtherance of astroturfing, and to trigger Plaintiff's Disability Symptoms, Gayle, similar to Murphy above, and along with Cartwright and Akers, falsely stated that Plaintiff was repeatedly abusive towards female employees. In furtherance of the scheme, Gayle published emails in which she falsely stated that Plaintiff engaged in a pattern of degrading and sexist comments.

73. Notwithstanding the fact that Gayle had waited over twenty-eight (28) months from the time such incidents had allegedly occurred, such allegations were materially false.

74. In addition, Murphy approached Gayle about fabricating evidence that Plaintiff was making the "work environment hostile". Gayle agreed to do so. Gayle sent Murphy an email that purported to document "multiple angry outbursts", concerns allegedly raised by others about Plaintiff's mental state and stability, "hostile" and "heated" exchanges, arguments and "volatile" conversations, "aggressive and combative behavior" and "negative attitude" – none of which "incidents" ever occurred.

75. As described above, DIA decided to remove the derogatory information about "abusive behavior" from Plaintiff's record in connection with these allegations because it was abjectly false.

76. In an effort to trigger Plaintiff's Disability Symptoms and impact his potential promotion in mid-2021, Gayle feigned that she was "concerned" about Plaintiff's "mental stability and for the safety and security of everyone in the branch."

77. At the time she republished the false statements in March 2021, Gayle knew that Plaintiff was not a danger to anyone in the office. Gayle knew that Plaintiff was confined to a knee scooter (as he was recovering from surgery) and could not harm anyone. She knew that the backpack Plaintiff carried with him contained Plaintiff's lunch and medicines.

78. Murphy republished (forwarded) Gayle's email to Cartwright.

79. At this time, Cartwright was aware that Plaintiff was having a strong adverse reaction to the medicine gabapentin, which has a very publicly known track record for mood altering effects, he was taking in connection with his Disability.

80. Significantly, Gayle (as well as Cartwright and Murphy) also knew that Plaintiff was about to present to an international Allied intelligence group and knew that Plaintiff would never have been allowed to present to that high-level group if Plaintiff was actually a danger to anyone.

81. Notwithstanding the foregoing, Cartwright used Gayle's email that Murphy forwarded as part of a false narrative that Plaintiff had professional and performance issues.

### Discrimination, Hostile Work Environment & Retaliation by Cartwright
### (Disability-based & Religion-based)

82. At all times relevant to this action, Cartwright was the GG-14, Branch Chief of ATI, Plaintiff's first level supervisor and permanent rater.

83. Cartwright had constructive knowledge of Plaintiff's Religion based on Plaintiff keeping several religious items on his desk.

84.  Cartwright had actual knowledge of Plaintiff's Religion because Plaintiff had complained to him regarding Murphy and the hostile work environment created by him.

85. As Plaintiff's supervisor, Cartwright had actual knowledge of a reasonable accommodation that had been provided by DIA to Plaintiff in connection with his Disability; specifically, DIA, as approved by Cartwright, had provided Plaintiff with a reasonable accommodation to work four (4), ten (10)-hour days to give him the flexibility to attend regular, Friday medical follow-ups for his Disability.

86. Cartwright had actual knowledge of Plaintiff's Disability since January 2019 since Plaintiff had provided him with medical information regarding his diagnosis. Cartwright refused to acknowledge Plaintiff's Disability despite medical information given to him and the fact that DIA had provided Plaintiff with a reasonable accommodation in connection with this Disability.

87. As an initial matter, Cartwright did absolutely nothing and condoned the behavior by Murphy in connection with Plaintiff's Religion, thus affirming Murphy's conduct and religious animus toward Plaintiff's Religion. Moreover, as identified *supra*, Cartwright put on an inquisition as to Plaintiff's religious beliefs and laughed raucously upon each response by Plaintiff.

88. Most importantly, however, is that with full knowledge of Plaintiff's Disability, Cartwright, in connection with other Defendant Employees, attempted to trigger, and successfully triggered, Plaintiff's Disability Symptoms, with a concerted effort toward harassing Plaintiff and creating a hostile work environment so pervasive and severe that Plaintiff would have no other choice but to resign from his employment.

89. In an attempt to trigger Plaintiff's Disability Symptoms, between January 2019 and up through Plaintiff's constructive discharge in June 2021, Cartright Cartwright published multiple, false statements about Plaintiff that impaired and adversely affected Plaintiff's employability.

90. By way of example, in 2021, Cartwright falsely stated that an ***unspecified person*** in the MARS program at DIA asserted that Plaintiff had "behavioral issues" within MARS while Plaintiff was SSTO. Cartwright also falsely stated that Plaintiff's MARS rotation was intended to be a two year rotation, but was "curtailed" for "behavioral issues" (in reference in Plaintiff's Disability), implying that Plaintiff was unfit for duty given his Disability.

91. Nothing could be further from the truth. Plaintiff's duties at DIA were whole-of-agency in scale with the potential to impact the entire United States Intelligence Community. Plaintiff was put on rotation to CIO because he was a top performer. Indeed, Plaintiff was selected over three other highly competitive candidates to be the ST Representative to MARS, and his team received an award for the work they did. Plaintiff's original rotation to MARS was intended to be for 1-2 years. The rotation to MARS was not "curtailed", and certainly not for any "behavioral" reasons, or otherwise.

92. By way of further example, Cartwright would commonly text Plaintiff at abnormal times in order to trigger his Disability Symptoms. For instance, he inappropriately texted Plaintiff at 9:30 pm on a Friday evening to discuss the results of the 2021 PAF.

93. By way of further example, Cartwright and Akers combined to falsely accuse Plaintiff of having "professional challenges" dealing with his peers. However, Plaintiff did not receive a single adverse counseling from MARS or CIO. The accusation that Plaintiff had "behavioral issues" or "professional challenges" was unsupported and fabricated.

94. By way of further example, Cartwright mocked Plaintiff after he had foot surgery, had to use a scooter, and was advised by his physician not to climb stairs. Cartwright granted the staff "morale leave" to attend an event, but when Plaintiff got there, he found out he had to climb two flights of stairs. When Plaintiff told Cartwright that he could not climb the stairs in his condition, Cartwright told Plaintiff that he had been warned about the event. On the first day he was off the scooter, there was a fire drill and Plaintiff had to walk up a hill, supported by two of his co-workers, because he did not want to get in trouble for failing to be at the meeting point. All the walking reinjured Plaintiff's foot and put him back on the scooter.  When Plaintiff filed for workman's compensation and put in the paperwork, Cartwright laughed at him.

95. By way of further example, Cartwright published and republished "Conversation Trackers" alleging that he had to regularly speak with Plaintiff about Plaintiff's working relationships. The "Conversation Trackers" were complete fabrications and never occurred. They were created to increase Plaintiff's Disability Symptoms, including his paranoia, stress, insomnia, and anxiety, in an attempt for Plaintiff to resign from his employment.

96. By way of further example, Cartwright accused Plaintiff of a serious integrity issue involving Plaintiff's working relationship with the local National Geospatial-Intelligence Agency ("NGA") office; specifically, Cartwright stated that Plaintiff "intended to deceive" DIA management concerning the existence of "friction" that occurred between  DIA and NGA as a result of changes that Cartwright, Gayle and others had made to a DIA/NGA slide presentation. Cartwright enlisted Gayle and LTC Daniel Gohlke ("Gohlke") to lie for him and support the false statements about Plaintiff.

97. The evidence associated this NGA issue went to a Performance Review Authority ("PRA"), who threw out the statements from Cartwright. Digital forensics revealed that all of Cartwright's evidence post-dated the reconsideration process initiation, meaning he made it up after the fact. This attempt to harm Plaintiff's integrity was an intentional and retaliatory effort to destroy Plaintiff's credibility in connection with complaints he had levied against Defendant Employees.

98. Cartwright, Murphy, Akers and Gayle jointly undertook the smear campaign using the same means and methods – publication of unsubstantiated and undocumented accusations about "behavioral issues" (tacitly attributed to Plaintiff's Disability) and other unspecified matters. Defendant Employees believed that the perceived severity of the putative conduct, coupled with Defendant Employees' ranks in the military, would ensure credibility at the Agency level.

**Plaintiff's 2021 PAF and Deferred Promotion**

99. Plaintiff was eligible for promotion in 2021, to be effectuated by mid-late 2021, which would have resulted in an increase in pay, benefits, and pension, and other career opportunities.

100.    In or around March 2021, Murphy, Cartwright and Akers conspired to injure Plaintiff in his employment by misrepresenting/fabricating incidents that they included in response to Plaintiff's FY 2021 PAF.

101.    On March 18, 2021, around two (2) months before Plaintiff was constructively discharged, in response to Plaintiff's 2021 PAF submission, Cartwright stated in a published email that Plaintiff was a poor team player and leader and rated Plaintiff as a "defer" for promotion because of a "lack of progress growing past shortcomings". Cartwright falsely stated that there were "gaps" in Plaintiff's professionalism; that Plaintiff's appraisals noted "trouble integrating with peers; and that "[Plaintiff's] professionalism and ability to work well with others has

regressed". Cartwright misrepresentations about Plaintiff were knowingly false and were made with the intent of triggering Plaintiff's Disability Symptoms.

102.     Cartwright further misrepresented in response to Plaintiff's 2021 PAF submission that Plaintiff had had unspecified "problems" with three (3) individuals, including, Kevin West ("West"), LTC Stacy Graham ("Graham") with the Office of the Under Secretary of Defense or Intelligence ("USDI"), and Cwengros, a government contractor described above. No complaints were made. No counseling occurred. Cartwright never informed Plaintiff about the so-called "problems". Cartwright completely manufactured the claim that Plaintiff had problems with representatives of USDI.  In fact, Plaintiff was praised with how he mitigated an issue that arose with West and a contractor who was openly abusive to DIA's Senior Technical Advisor, a female employee, that led to such employee filing a formal complaint. Cartwright misrepresentations about Plaintiff were knowingly false and were made with the intent of triggering Plaintiff's Disability Symptoms.

103.     Further, Cartwright, along with Murphy, generally misreported that Plaintiff had extreme difficulty working with different people, communicating any kind of disagreement or difference of opinion with a variety of personality types and ranks, was very caustic, and caused a lot of disruption at work.  However, they could not cite a specific incident in which any of this had been reported or was true. Cartwright and Murphy's statements about Plaintiff were knowingly false and were made with the intent of triggering Plaintiff's Disability Symptoms.

104.     Cartwright further suggested that "someone" had to be removed from Plaintiff's team in early 2019 because Plaintiff was "bullying" the individual. However, this statement was knowingly false, and the circumstances were reported to Cartright with Defendants' representative,

22

A. Scott Morgan ("Morgan") as a witness. The employee removed from the team, Art Riles ("Riles"), refused to work except on things specific to his background.  He also sent abusive and condescending communications outside the Agency from the office.  Plaintiff privately counseled Riles, and provided the transcript of the counseling to Cartwright, who commented that it was a very detailed record.  All of these records still exist.  Riles had to be removed from the team because he wouldn't work, and for no other reasons. Plaintiff did not bully anyone. Cartwright's statements about Plaintiff were knowingly false and were made with the intent of triggering Plaintiff's Disability Symptoms.

105.    Cartwright further falsely stated that "accuracy" was an issue for Plaintiff, and that Plaintiff tended to "play loose" with the facts when reporting things up the chain of command. Cartwright falsely asserted that he discussed this issue with Plaintiff "every month for six months straight".  Strangely, there is not a single document to corroborate Cartwright's representations. Cartwright's statements about Plaintiff were knowingly false and were made with the intent of triggering Plaintiff's Disability Symptoms.

106.    Plaintiff had received similar treatment in connection with his FY 2019 PAF. It was so severe and unprecedented that Johnny O. Sawyer ("Sawyer"), then DIA Chief of Staff [https://www.linkedin.com/in/johnny-sawyer-2b59a313a], intervened. Sawyer overruled Cartwright's performance appraisal for FY 2019 because it was fraudulent, and upgraded Plaintiff's performance rating to Outstanding for which Plaintiff received a bonus.

107.    As Plaintiff was reliving his nightmare from 2019, Plaintiff sent Sawyer an email, complaining of the psychological abuse by Cartwright in connection with his 2021 PAF and

promotion opportunity:

Stewart, John C CIV DIA (US) <John.Stewart@dodiis.mil>
Mon 3/22/2021 11:15 AM
To: Sawyer, Johnny O CIV DIA (US) <Johnny.Sawyer@dodiis.mil>
Sir,

I am sorry to bother you with this ongoing issue with Mr. Cartwright. This is the second year in a row in
which Mr. Cartwright has made demonstrably false official statements about my professionalism,
integrity, and ability.

I have forwarded Mr. Cartwright's comments to my rating chains of the past two rating periods as he
claims his words originate with them.

At no time has anyone from MARS to CIO counseled me on any lack of ability, shortcomings,
communications issues, etc. Quite the contrary, for example, I am the POC for the communications plan
for the DIA Data Hub to socialize this effort to the agency as a whole, among other duties.

Mr. Cartwright has demonstrated a repeated pattern of behavior to make claims that are not
substantiated in fact, such as the 2019 appraisal that you reviewed and found fully in my favor. Mr.
Cartwright has been permitted to wage what appears to be some form of personal vendetta against me
for far too long. This latest attempt to intentionally and specifically curb my ability to advance in the
agency is a clear demonstration of abuse of authority, lack of integrity and trustworthiness, libel, and
endemic bullying. Apart from Mr. Cartwright, my work experience is quite peaceful.

I eagerly await a response at your earliest convenience.

Very Respectfully,
John C. Stewart

108.     Cartwright was so brazen and proud of his confidence in any lack of accountability

that he personally emailed his defamatory comments to Plaintiff the day that he submitted them to

the promotion panel, which was in contravention of established agency practice.

109.     Plaintiff was ultimately denied a promotion by Defendants in connection with false

and retaliatory feedback described above by Cartwright, Murphy, and Akers, and his promotional

opportunity was deferred.

110.     Plaintiff was not treated the same as any similarly situated employee in this regard.

There were no other employees in ST whose promotions were deferred.

111.     Defendants' deferral of Plaintiff's promotion was emotionally and financially

devastating and unjust because it was based on discrimination and falsehoods published by

Cartwright, Murphy and Akers. The recommendation to defer promotion meant non-promotion

was guaranteed.  Top comments and top ratings are needed for career advancement at DIA, which ultimately affects pay, benefits, and retirement.

## **Plaintiff was Constructively Discharged**

112.    Plaintiff was forced to retire roughly fifteen (15) early.

113.    The unabated discrimination, hostile work environment, and retaliation in connection with Plaintiff's Disability and Religion had taken a significant toll on his mental and physical health. Plaintiff's doctors thought the situation was an imminent threat to Plaintiff's life.

114.    Plaintiff retired early on the basis of his Disability.  He initiated the process. Akers, who knew about Plaintiff's Disability when Plaintiff rotated to CIO, signed off on the paperwork.

115.    Plaintiff endured years of Disability discrimination.

116.    As proof of Defendants' discrimination and retaliation against Plaintiff, Defendant Employees gathered memos and records to attack Plaintiff's character and professionalism, but, significantly, failed to intervene, discipline, or remove Plaintiff from his position as a result of the alleged "behavioral" problems.

117.    Defendants' discrimination and false statements had a devasting impact on Plaintiff's health and employment, which is exceptionally well documented by the Veterans Administration as well as by medical professionals in private practice.  For over a year, Plaintiff apprised his superiors of Defendant Employees' misconduct.

> The actions of these officers has also been very triggering for my injuries from active duty military service. If I should leave employment within DIA, the level and extremity of managerial abuse and violation of law will be the reason why.
>
> Lastly, my daily duties bear no resemblance to the kind of person whom management alleged I am. I am on a rotation and by Agency definition am a top performer.

118.     The continuous abuse and constant predatory actions by Cartwright, Murphy, Akers and Gayle ultimately caused Plaintiff's service-connected combat Disability to become permanent and totally disabling.

119.     In connection with his Disability Plaintiff suffered Disability Symptoms, including nightly nightmares affecting his brain activity and sleep.

120.     Plaintiff lives in fear, waking or sleeping, that the Defendants will continue to find ways to hurt him. Plaintiff feels completely helpless and prostrate from the attacks.

121.     At all times relevant to this action, Defendants knew that the discrimination and hostile work environment would trigger Plaintiff's Disability.

122.     Defendants' actions took Plaintiff back to a mass grave in Kosovo looking at murdered civilians, who were brutally slain because they were of another creed and faith. Plaintiff feels that he is lying next to the dead, all shot to hell by false statements published by persons who relish every drop of blood they spill in full knowledge and belief that no one will ever hold them accountable.

123.     Since retiring from DIA, Plaintiff has been offered lucrative positions, which he is unable to accept because of the deeply severe physical and psychological injuries caused by the Defendants' abuse and misconduct.

124.     Plaintiff's health has been permanently affected by the bureaucratic terror campaign inflicted upon him. Plaintiff has lost friendships, professional associations and his career as a result of Defendants' misconduct.  Plaintiff did nothing to deserve the discrimination, hostile work environment, retaliation, and ultimately, constructive discharge that Defendant Employees inflicted on Plaintiff.

125.     Such conduct of Defendants at the hands of the Defendant Employees for a combat-veteran is reprehensible and they should be held accountable.

## CAUSES OF ACTION

### COUNT I
### Hostile Work Environment (Religion) in Violation of Title VII

126.     Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this First Amended Complaint with the same force and vigor as if set out here in full.

127.     At all times Plaintiff was a member of a protected class. Plaintiff maintains a sincerely held religious belief associated with his Religion (Catholicism).

128.     Defendants, through DOD, DIA and Defendant Employees, discriminated against Plaintiff on the basis of his religion in regard to his advancement, compensation, discharge, and other terms, conditions, and privileges of employment.

129.     Defendants, through DOD, DIA and Defendant Employees, created and subjected Plaintiff to a hostile work environment because of Plaintiff's sincerely-held religious beliefs. Defendants, through DOD, DIA and Defendant Employees, subjected Plaintiff to unwelcome harassment because of Plaintiff's religious beliefs.

130.     Plaintiff's workplace was  permeated with discriminatory intimidation, ridicule and insult.  The harassment was sufficiently severe or pervasive so as to alter a term, condition, or privilege of employment, and create an abusive work environment.  Plaintiff subjectively perceived his workplace environment was hostile, and a reasonable person would so perceive that it was objectively hostile, considering the frequency of the discriminatory conduct; its

severity; the threatening and humiliating nature of the misconduct; and the fact that it unreasonably interfered with Plaintiff's work performance.

131.    Murphy, an employee of Defendants and a supervisor of Plaintiff, is Protestant and openly expressed disdain for Plaintiff's Religion.

132.    From January 2019 through and up to Plaintiff's constructive discharge in June 2021, Murphy repeatedly subjected Plaintiff to unwelcome conduct regarding his Religion, including:

    a.  Lecturing Plaintiff on Catholics in Northern Ireland versus Irish Protestants;

    b.  Modifying his uniform only to consistently mock Plaintiff (routinely pointing to his orange bracers);

    c.  Creating a narrative that Plaintiff was abusive toward female employees because he was Catholic;

    d.  Insulting Plaintiff with a bottle of wine he smuggled into the office (which was later reported to DIA) and mocking a religious holiday of Plaintiff; and

    e.  Routinely lecturing and mocking Plaintiff, consistently over a period of 2 years, regarding the problems he had with Catholic theology and its moral teachings.

133.    Murphy's unwelcome conduct was so severe and pervasive that it altered Plaintiff's conditions of employment by impacting his ability to work. Plaintiff would routinely need to stop working to simply report Murphy to Cartwright and become flustered and unable to work given the intense stress Murphy caused Plaintiff in connection with the ongoing harassment of his Religion.

134.    Plaintiff complained repeatedly of such conduct, both to his supervisor Cartwright

on multiple occasions spanning in 2019 through 2021, who was dismissive, and to General

Ashley, on March 14, 2020, who merely acknowledge receipt and promised a response by OIG,

which never came. No further action, investigation or remedial action took place subsequent to

Plaintiff reporting such hostile work environment.

135.    As a direct, foreseeable, and proximate of Defendants' unlawful conduct,

including through Defendant Employees, Plaintiff has suffered, and will continue to suffer,

generally physical, mental, and psychological damage in the form of extreme and enduring

worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, all to

his damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

136.    As a direct, foreseeable, and proximate result of Defendants' unlawful conduct,

Plaintiff has been injured in that he has suffered, and will continue to suffer, a loss of wages and

salary, bonuses, compensation, employment benefits, career path opportunities, expenses, and

attorneys' fees, in an amount to be proven at trial.

**COUNT II**
**Retaliation (Religion) in Violation of Title VII**

137.    Plaintiff hereby incorporates by reference and re-alleges each of the allegations

contained in all preceding paragraphs of this First Amended Complaint with the same force and

vigor as if set out here in full.

138.    At all times Plaintiff was a member of a protected class. Plaintiff maintains a

sincerely held religious belief associated with his Religion (Catholicism).

139.    Plaintiff engaged in protected activity when he complained repeatedly of the

hostile work environment associated with his Religion, both to his supervisor Cartwright on

multiple occasions spanning in 2019 through 2021, who was dismissive, and to General Ashley,

on March 14, 2020, who merely acknowledge receipt and promised a response by OIG, which never came. No further action, investigation or remedial action took place subsequent to Plaintiff reporting such hostile work environment.

140.    As a result of engaging in protected activity, Defendant Employees retaliated against Plaintiff by spreading and publishing false information in an attempt to prevent Plaintiff from receiving a promotion in 2021.

141.    Murphy, in particular, a supervisor of Plaintiff, provided, substantial and false information regarding Plaintiff's performance as retaliation for Plaintiff reporting Murphy to Cartwright in connection with the hostile work environment created by Murphy in connection with Plaintiff's Religion.

142.    Defendant Employees succeeded in their operation and Plaintiff's promotion was deferred.

143.    No other employees of ST received a deferred promotion.

144.    Plaintiff suffered an adverse employment action in that he was not promoted in 2021, and anticipated he would now not be promoted at all given that his promotion was deferred.

145.    No similarly situated person received the same adverse employment action as Plaintiff.

146.    As a direct, foreseeable, and proximate of Defendants' unlawful conduct, including through Defendant Employees, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damage in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, all to

his damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

147.    As a direct, foreseeable, and proximate result of Defendants' unlawful conduct,

Plaintiff has been injured in that he has suffered, and will continue to suffer, a loss of wages and

salary, bonuses, compensation, employment benefits, career path opportunities, expenses, and

attorneys' fees, in an amount to be proven at trial.

<u>**COUNT III**</u>
<u>**Hostile Work Environment (Disability) in Violation of the Rehab Act**</u>

148.    Plaintiff hereby incorporates by reference and re-alleges each of the allegations

contained in all preceding paragraphs of this First Amended Complaint with the same force and

vigor as if set out here in full.

149.    At all times relevant to this action, Plaintiff could perform the essential functions

of his employment position.

150.    At all times Plaintiff was a qualified individual with a Disability.

151.    Plaintiff had a known Disability, was perceived disabled by Defendants, and had

received a reasonable accommodation by DIA associated with such Disability.

152.    Plaintiff's Disability Symptoms occur periodically, and can be  triggered by others

yelling at, berating, or threatening to assault him.

153.    Plaintiff's Disability Symptoms, periodically, substantially limit his brain function,

day-to-day activities, sleeping, and work activities.

154.    Defendants, through DOD, DIA and Defendant Employees, discriminated

against Plaintiff on the basis of his Disability in regard to his advancement, compensation,

discharge, and other terms, conditions, and privileges of employment.

155.     Defendants, through DOD, DIA and Defendant Employees, created and subjected Plaintiff to a hostile work environment because of Plaintiff's Disability. Defendants, through DOD, DIA and Defendant Employees, subjected Plaintiff to unwelcome harassment because of Plaintiff's Disability.

156.     Plaintiff's workplace was permeated with discriminatory intimidation, ridicule and insult. The harassment was sufficiently severe or pervasive so as to alter a term, condition, or privilege of employment, and create an abusive work environment. Plaintiff subjectively perceived his workplace environment was hostile, and a reasonable person would so perceive that it was objectively hostile, considering the frequency of the discriminatory conduct; its severity; the threatening and humiliating nature of the misconduct; and the fact that it unreasonably interfered with Plaintiff's work performance.

157.     Cartwright, Akers, and Gayle, were all supervisors or in a superior position of Plaintiff.

158.     Plaintiff was subjected to unwelcome harassment based on his Disability by Cartwright, Akers, and Gayle; specifically:

      a.  Akers, having actual knowledge of Plaintiff's Disability and believing that because of Plaintiff's Disability he was unable to advance professionally and was ineligible for promotion, made multiple, false statements about him and gave Plaintiff a negative rating, which triggered Plaintiff's Disability Symptoms;

      b.  Gayle, having actual knowledge of Plaintiff's Disability, made, and spread, multiple false statements regarding Plaintiff's Disability (re: mental health); and

      c.  Cartwright, personally inflicted upon Plaintiff a concerted effort to force him to

resign from his position and to constantly trigger Plaintiff's Symptoms.

159.    The unwelcome harassment of Akers, Gayle, and especially Cartwright, was so severe and pervasive that it altered Plaintiff's conditions of employment by impacting his ability to work and causing substantial, health problems. Plaintiff's Disability Symptoms ultimately worsened as a result of such unwelcome harassment leading to Plaintiff's constructive discharge.

160.    As a direct, foreseeable, and proximate of Defendants' unlawful conduct, including through Defendant Employees, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damage in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, all to his damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

161.    As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in that he has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, expenses, and attorneys' fees, in an amount to be proven at trial.

## COUNT IV
## Retaliation (Disability) in Violation of the Rehab Act

162.    Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this First Amended Complaint with the same force and vigor as if set out here in full.

163.    At all times Plaintiff was a qualified individual with a Disability.

164.    Plaintiff engaged in protected activity when he complained to General Ashley of discrimination associated with his Disability, on March 14, 2020, who merely acknowledge receipt and promised a response by OIG, which never came. No further action, investigation or

remedial action took place subsequent to Plaintiff reporting such hostile work environment.

165.     Moreover, Plaintiff engaged in protected activity when filed a charge of discrimination on June 1, 2021.

166.     As Plaintiff had no other sources to report the improper conduct associated with his Disability given that all his supervisors were the bad actors, Plaintiff sent an email to Sawyer in March 2021 in attempt engage in further protected activity.

167.     As a result of engaging in protected activity, Defendant Employees retaliated against Plaintiff by spreading and publishing false information in an attempt to prevent Plaintiff from receiving a promotion in 2021, and ultimately pushed him to resign (constructive discharge) from his employment.

168.     Defendant Employees succeeded and Plaintiff's promotion was deferred.

169.     No other employees of ST received a deferred promotion.

170.     No similarly situated person received the same adverse employment action as Plaintiff.

171.     Plaintiff resigned in connection with his Disability in June 2021.

172.     Plaintiff suffered an adverse employment action in that he was not promoted in 2021, and anticipated he would now not be promoted at all given that his promotion was deferred.

173.     Plaintiff further suffered an adverse employment action when was temporarily dissuaded by Defendants from pursuing or supporting a charge of discrimination.

174.     Plaintiff further suffered an adverse employment action when was he constructed discharged from his employment.

34

175.    As a direct, foreseeable, and proximate of Defendants' unlawful conduct, including through Defendant Employees, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damage in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, all to his damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

176.    As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in that he has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, expenses, and attorneys' fees, in an amount to be proven at trial.

## COUNT V
## Discrimination and Constructive Discharge (Disability) in Violation of the Rehab Act

177.    Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this First Amended Complaint with the same force and vigor as if set out here in full.

178.    The working conditions of Plaintiff became so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign.

179.    The unabated discrimination, hostile work environment, and retaliation in connection with Plaintiff's Disability had taken a significant toll on his mental and physical health. Plaintiff's doctors thought the situation was an imminent threat to Plaintiff's life.

180.    Plaintiff's working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign; specifically, any reasonable person whose doctors informed them that they may die if they stayed employed would similarly resign from their employment as Plaintiff did.

181.     As a result of these conditions, Plaintiff was forced to resign in connection with his Disability.

182.     All statements and performance issues which were negative of Plaintiff were fabricated. At the time of his forced resignation (constructive discharge), Plaintiff was performing his job at a level that met his employer's legitimate expectations.

183.     As a direct, foreseeable, and proximate of Defendants' unlawful conduct, including through Defendant Employees, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damage in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, all to his damage, in amounts within the jurisdictional limits of this Court, to be proved at trial.

184.     As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in that he has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, expenses, and attorneys' fees, in an amount to be proven at trial.

### RESERVATION OF RIGHTS

Plaintiff alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession. He believes that substantial additional evidentiary support, which is in the exclusive possession of the Defendants, their employees, clients, agents, surrogates, and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery. Plaintiff reserves the right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## DEMAND FOR JURY TRIAL

In accordance with F.R.C.P. 38(b), Plaintiff demands a trial by jury of the within action,

including the First Amended Complaint, and any further pleadings.

## CONCLUSION

WHEREFORE, the premises considered, Plaintiff respectfully prays that this Honorable Court:

A.    Enter judgment on his behalf against Defendants;

B.    Award Plaintiff compensatory damages in an amount to be proven a trial;

C.    Award Plaintiff his taxable costs, expenses, attorneys' fees, pre-judgment interest
and post-judgement interest, as applicable;

D.    Declare that Defendants' conduct is in violation of Title VII of the Civil Rights
Act of 1964 and the Rehabilitation Act, as applicable; and

E.    Grant such other relief as this Court may consider just and proper.

Dated: January 13, 2025,                    Respectfully submitted,

JOHN STEWART

By: /s/  Robert Powers_____
Robert Powers, Esq.
Tyler M. Roth, Esq.
MCCLANAHAN POWERS, PLLC
3160 Fairview Park Drive, Suite 410
Falls Church, VA 22042
Telephone: (703) 520-1326
Facsimile:(703)828-0205
Email:rpowers@mcplegal.com
        troth@mcplegal.com
        mmurawiec@mcplegal.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system, which will deliver a true and correct copy of the foregoing document via CM/ECF.

Date: January 13, 2025,          By: /s/   Robert Powers
                                    Robert Powers