CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

September 22, 2025
LAURA A. AUSTIN, CLERK
BY  s/ S. MELVIN
    DEPUTY CLERK

## IN THE UNITED STATES DISTRCIT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

JOHN C. STEWART,

          *Plaintiff,*

    v.

PETE HEGSETH,[1] SECRETARY OF DEFENSE,
AND UNITED STATES OF AMERICA,

          *Defendants.*

CASE NO. 3:22-CV-00043

MEMORANDUM OPINION & ORDER

JUDGE NORMAN K. MOON

This case comes to the Court on Defendants Secretary Hegseth and the United States' (collectively, the "Government") second Motion to Dismiss for Failure to State a Claim. Dkt. 80. The Government previously filed a Motion to Dismiss for Failure to State a Claim, dkt. 73, which Plaintiff John Stewart responded to by filing an amended complaint. Dkt. 77. This memorandum opinion and order addresses both motions to dismiss.

In his amended complaint, Plaintiff John Stewart raises five religious and disability discrimination claims stemming from his employment at the Defense Intelligence Agency ("DIA"). Dkt. 77. In Count I, Stewart alleges that the Government violated Title VII of the Civil Rights Act by creating a hostile work environment based on religious discrimination. 42 U.S.C. § 2000e *et seq.*; dkt. 77 ¶ 129. In Count II, he contends that the Government retaliated against him for reporting this religious discrimination, further violating Title VII. 42 U.S.C. § 2000e *et seq.*; dkt. 77 ¶ 141. In Count III, Stewart alleges that the Government violated the Rehabilitation Act

---

[1] When Stewart filed the complaint, he named then-Secretary of Defense Lloyd Austin as a Defendant. Dkt. 77. The Government properly switched out the parties when filing their Memorandum in Support of their Motion to Dismiss. Dkt. 81.

of 1973 ("Rehab Act"), by creating a hostile work environment based on disability

discrimination. 29 U.S.C. § 791, *et seq.*; dkt. 77 ¶ 154. In Count IV, he claims that the

Government retaliated against him for reporting disability discrimination, violating the Rehab

Act. 29 U.S.C. § 791, *et seq.*; dkt. 77 ¶¶ 164, 167. And finally, in Count V, Stewart alleges that

the Government constructively discharged him, causing him to resign from DIA in June 2021,

further violating the Rehab Act. *Id.*; dkt. 77 ¶ 180.

For the reasons stated below, the Court will deny the Government's second motion to

dismiss Counts I and III. The Court will grant the Government's second motion to dismiss

Counts II and IV without prejudice. The Court will grant the Government's second motion to

dismiss Count V with prejudice. The Court will dismiss the Government's first motion to dismiss

as moot.

## LEGAL STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a

complaint to determine whether a plaintiff has stated a claim such that the court can grant relief.

The complaint's "[f]actual allegations must be enough to raise a right to relief above the

speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff's allegations

must be taken as true, and all reasonable inferences must be drawn in the plaintiff's favor during

12(b)(6) motions to dismiss. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

A complaint "does not need detailed factual allegations" to survive a 12(b)(6) motion;

however, a plaintiff must provide "more than labels and conclusions [or] a formulaic recitation of

the elements of a cause of action." *Twombly*, 550 U.S. at 555. When considering these motions, a

court need not "accept the legal conclusions drawn from the facts" or "accept as true

unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. &*

*Loan Inv.*, *LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted). Rule 12(b)(6) does

not require "heightened fact pleading;" however, the plaintiff must plead "enough facts to state a

claim to relief that is plausible on its face" to survive a Rule 12(b)(6) motion. *Twombly*, 550 U.S.

at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (providing that "only a complaint that

states a plausible claim for relief survives a motion to dismiss").

<u>FACTS</u>

The following facts are all alleged and the Court must accept them as true for the

purposes of this motion. *Simmons*, 634 F.3d at 768. Plaintiff John Stewart is a "devout Catholic"

and a "disabled combat veteran who suffers . . . from post-traumatic stress disorder." Dkt. 77 ¶¶

8-9. He worked for DIA from 2014-2021. *Id.* ¶¶ 20, 26. Stewart raises employment

discrimination claims against both Secretary of Defense Pete Hegseth and the United States, who

is a "substituted party" for several DIA employees.[2]  Stewart raises five claims in total alleging

both religious and disability discrimination. *Id.* ¶¶ 129, 141, 154, 167, 180.

Stewart alleges the religious discrimination began in October 2018, largely at the hands

of Rhett Murphy, his "Deputy Division Chief." Dkt. 77 ¶¶ 33-34. During the nearly three-year

period before Stewart's alleged constructive discharge, Murphy "repeatedly lectured [Stewart]

about the Catholics in Northern Ireland" and "impl[ied] that [Stewart] held beliefs and prejudices

against Irish protestants." *Id.* ¶ 35. Murphy "relentless[ly] focus[ed]" on Stewart's religion. *Id.* ¶

36. Murphy "modif[ied] his duty uniform" by adding "bright orange boot blousers"[3] which he

would "point to . . . and laugh." *Id.* ¶¶ 37, 40. Stewart found Murphy's conduct "expressly

---

[2]        The United States was substituted on November 7, 2024 upon its own motion for the following DIA
employees: Stewart's Branch Chief, Theodor Cartwright; Stewart's "Deputy Division Chief," Rhett Murphy;
Stewart's "rotational supervisor and rater," Frank Akers; and Stewart's "quasi-supervisor," Elizabeth Gayle. Dkt.
72; dkt. 77 ¶¶ 2-3, 30, 33, 55, 70, 82.
[3]        The Government notes that boot blousers are "thin elastic straps worn to allow a soldier to tuck his or her
pants in" that help "present a uniform military appearance." Dkt. 81 at 2 n.2. However, boot blousers "are not
visible" when looking at a military uniform as it is typically worn. *Id.*

offensive and hateful" as the color orange is "associated with . . . a Protestant fraternal society . . . that has historically opposed Catholicism." *Id.* ¶¶ 37, 39. Murphy also falsely accused Stewart, reporting Stewart "said that DIA was not a safe workspace for Catholics" and that he was "abusive toward female employees because he was Catholic." *Id.* ¶¶ 41-42.

In one alleged event, Murphy "attempted to give Stewart a bottle of wine" on a Holy Monday in the Catholic calendar. Dkt. 77 ¶ 44. After Stewart "reminded Murphy it was a Holy Monday," Murphy "sarcastically responded that he figured [Stewart] would 'appreciate having the wine on Holy Thursday for the Seder meal, as part of the Jewish Passover." *Id.* ¶ 45. When later confronted about the incident, Murphy "claimed the wine was . . . 'consecrated sacramental wine,'" a statement Stewart later learned about. *Id.* ¶¶ 49, 51. As a Catholic, Stewart believes consecrated wine is "the Most Holy Eucharist" or the "literal body, blood, soul, and divinity of Jesus Christ," making Murphy's joke deeply offensive to him. *Id.* ¶¶ 49-50.

Stewart alleges reporting Murphy's religious discrimination to his Branch Chief, Theodor Cartwright, on two separate occasions. Dkt. 77 ¶¶ 40, 47, 82. Cartwright responded to these reports by "burst[ing] out laughing" and "put[ting] on an inquisition as to [Stewart's] religious beliefs," causing Stewart "physical discomfort." *Id.* ¶¶ 40, 47-48, 87. Cartwright "did absolutely nothing" after Stewart reported Murphy and "condoned [Murphy's] behavior." *Id.* ¶ 87. After these reports, Stewart alleges Murphy "retaliated" by "falsely represent[ing] that [Stewart] failed to meet the very minimal qualifications to be a GG-14" among other "fabricated, poor reviews," eventually leading to Stewart "not receiving a promotion in May 2021 and his constructive discharge in June 2021." *Id.* ¶ 52.

Stewart likewise alleges disability discrimination at the hands of Frank Akers, his "rotational supervisor and rater; Theodor Cartwright, his "Branch Chief;" and Elizabeth Gayle,

4

his "quasi-supervisor." Dkt. 77 ¶¶ 55, 70, 82. Because of his PTSD, Stewart received a

"reasonable accommodation to work four (4), ten (10) hour days," an accommodation allegedly

known by Stewart's supervisors. *Id.* ¶¶ 56, 85. Stewart alleges that Akers "gave [him] a negative

rating . . . because of [his] [d]isability" and made false statements about him, including that he

"had work performance issues," that his "supervisors . . . did not like him," that a "project got

moved" because of him, and that a female employee said "she would quit if she was forced to

work with [him]." *Id.* ¶¶ 59-61, 63-64. Stewart alleges Akers' statements were "knowingly false"

as he had "no issues" with his supervisors or female employees and was a "top performer" who

was given "increasingly important job responsibilities" because his "work was good." *Id.* ¶¶ 64,

67, 69.

Stewart also alleges Gayle made "materially false" accusations against him, including

that he was "repeatedly abusive towards female employees," that he "ma[de] the 'work

environment hostile,'" that he had "multiple angry outbursts," and that others had concerns about

his "mental state and stability." Dkt. 77 ¶¶ 72-74. Gayle memorialized these accusations in an

email to Murphy, which Stewart alleges was forwarded to Cartwright. *Id.* ¶¶ 74, 78. According

to Stewart, DIA "remove[d] the derogatory information about 'abusive behavior' from

[Stewart's] record in connection with these allegations because it was abjectly false." *Id.* ¶ 75.

Stewart alleges Gayle undertook this "smear campaign" "in an effort to trigger [his] [d]isability

[s]ymptoms and impact his potential promotion in mid-2021." *Id.* ¶¶ 76, 98.

Stewart further alleges Cartwright's participation in the "disinformation operation"

against him. Dkt. 77 ¶ 16. During this period, he claims that Cartwright "falsely stated" that

Stewart had "behavioral issues;" that Cartwright "impl[ied] that [Stewart] was unfit for duty

given his [d]isability;" that Cartwright "commonly text[ed] [Stewart] at abnormal times in order

to trigger" him. *Id.* ¶¶ 90, 92. Stewart further alleges that Cartwright "mocked [Stewart] after he had foot surgery;" that Cartwright published "complete[ly] fabricat[ed]" records showing he had to "regularly speak with [Stewart] regarding [his] working relationships;" and that Cartwright "accused [Stewart] of a serious integrity issue." *Id.* ¶¶ 94-96.

According to Stewart, these false statements—and many more—caused him to be "denied a promotion" during the 2021 evaluation cycle, a decision he alleges was "emotionally and financially devastating and unjust" as it was "based on discrimination and falsehoods published by Cartwright, Murphy, and Akers." Dkt. 77 ¶¶ 109, 111. Stewart alleges the "unabated discrimination, hostile work environment, and retaliation" took a "significant toll on his mental and physical health," so much so that his physicians thought the job was "an imminent threat to [his] life." *Id.* ¶ 113. As the discrimination became "permanent and totally disabling," Stewart made the difficult decision to retire "fifteen (15) years earlier than he would have otherwise retired." *Id.* ¶ 26.

## ANALYSIS

### A. Plaintiff's Claims for Hostile Work Environment Survive the Motion to Dismiss

To state a claim of a hostile work environment, a plaintiff must allege that the harassment was: "(1) unwelcome, (2) because of religion [or disability], (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer." *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313 (4th Cir. 2008). Courts analyze hostile work environment claims under an objective standard, meaning the environment "would reasonably be perceived as hostile, and is perceived, as hostile or abusive . . . by looking at all the circumstances." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The Fourth Circuit uses this

framework to analyze hostile work environment claims under both Title VII and the Rehab Act. *See Pueschel v. Peters*, 577 F.3d 558, 560, 564-65 (4th Cir. 2009). The Government argues Counts I (hostile work environment based on religious discrimination) and III (hostile work environment based on disability discrimination) must fail under this framework. Dkt. 81 at 7. The Court disagrees as to both counts.

      *a.   Stewart Alleges Severe and Pervasive Religious Discrimination under Title VII*

The Government argues that Stewart's claim for hostile work environment based on religious discrimination fails as he has not pled "that any unwelcome conduct was so severe and pervasive as to alter the terms and conditions of his employment at DIA." Dkt. 81 at 7.[4] The Court disagrees.

As a threshold matter, Stewart argues that the question of severity and pervasiveness is "quintessentially a question of fact" inappropriate for the motion to dismiss stage. Dkt. 83 at 5. However, the Fourth Circuit often evaluates this question at the motion to dismiss stage. *See, e.g.*, *Decoster v. Becerra*, 119 F.4th 332, 339 (4th Cir. 2024); *Barnhill v. Bondi*, 138 F.4th 123, 140-41 (4th Cir. 2025); *Holloway v. Maryland*, 32 F.4th 293, 301 (4th Cir. 2022). Thus, the Court will hear these claims at this motion to dismiss stage.

To allege severe or pervasive conduct, plaintiffs must pass a "a high bar." *Sunbelt Rentals*, 521 F.3d at 315. Anti-discrimination statutes do not "establish a 'general civility code for the American workplace;'" therefore, employer conduct must be so extreme as to "amount to a change in terms and conditions of employment." *Id.* Conduct need not be both severe and pervasive to establish a hostile work environment claim. An actionable claim may be based on

---

[4] The Government does not dispute any other elements of Stewart's hostile work environment claim. Dkt. 81. Thus, the Court finds that Stewart has alleged sufficient facts to establish that harassment was unwelcome; because of Stewart's religion or disability, and imputable to DIA. *Sunbelt Rentals*, 521 F.3d at 313.

either severity or pervasiveness to prevail under the hostile work environment framework.
*Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986).

When evaluating if employer conduct is severe or pervasive, the Fourth Circuit considers "the status of the harasser" as well as "the frequency of the discriminatory conduct; its severity; whether it's physically threating or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015); *Laurent-Workman v. Wormuth*, 54 F.4th 201, 211 (4th Cir. 2022). Courts treat supervisor harassment as "particularly threatening" in hostile work environment cases. *Boyer-Liberto*, 786 F.3d at 278.

The Court considers whether Stewart's allegations about religious discrimination are sufficiently severe and pervasive to establish a hostile work environment under Title VII. The Government argues Murphy's "supposedly unwelcome conduct" was "not egregious," not "physically threatening or intimidating" and did not "unreasonably interfere" with Stewart's work—nor was it "more than episodic"—meaning the discrimination could not be severe or pervasive under Title VII. Dkt. 81 at 10-12. The Court disagrees.

Though not "mathematically precise," the Court will apply the *Wormuth* test to Murphy's conduct, first considering the "frequency" Stewart alleges. 54 F.4th at 211; *Sunbelt Rentals*, 521 F.3d at 313. According to Stewart, Rhett Murphy "repeatedly abused" him for a two-and-a-half-year period, from "October 2018" through "June 2021." Dkt. 77 ¶ 34. During this period, Stewart claims that Murphy "repeatedly lectured" Stewart, assuming he had "prejudices against Irish Protestants;" had "relentless focus" on Stewart's religion; and "continuously express[ed]" problems with Catholic theology. *Id.* ¶¶ 34-36, 54. Stewart does not allege specific facts regarding how often these "repeated" and "continuous" events took place. However, Stewart's

allegations state more frequent behavior than many cases dismissed under Title VII. *See*

*Holloway*, 32 F.4th at 301 (holding no hostile work environment with conduct occurring over

several months); *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 210 (4th Cir. 2019) (holding no

hostile work environment for conduct occurring twice in two years). As such, this factor cuts in

favor of severity and pervasiveness.

Next, the Court considers the conduct's "severity" and "whether [the conduct is]

physically threating or humiliating, or a mere offensive utterance." *Wormuth*, 54 F.4th at 211.

Stewart does not allege ever feeling physically threatened by Murphy. However, many of

Murphy's alleged false statements, as well as his conduct, are quite humiliating. Murphy

allegedly spread that Stewart "was abusive toward female employees because he was Catholic."

Dkt. 77 ¶ 42. Murphy "fabricated . . . that [Stewart] . . . said DIA was not a safe workspace for

Catholics." *Id.* ¶ 41. When confronted about the bottle of wine Murphy tried to give Stewart,

Murphy lied, saying it was "consecrated sacramental wine." *Id.* ¶ 49. Stewart alleges he found

Murphy's lie to be "so severe" that he considered Murphy a "physically and theologically equal

to those who personally nailed Christ to the cross." *Id.* ¶ 51.

As Murphy was Stewart's supervisor, his conduct is considered "particularly

threatening." *Boyer-Liberto*, 786 F.3d at 278. Stewart's allegations demonstrate that a reasonable

person facing this conduct would find it to be humiliating; and his allegations are comparable to

other Title VII hostile work environment cases that have survived motions to dismiss. *See, e.g.*,

*E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176-77 (4th Cir. 2009) (finding conduct to be

"severe or pervasive" when Black female plaintiff faced racial slurs being used "pretty much

every day" as well as a co-worker "watch[ing] pornography on his computer" in her presence);

*Sunbelt Rentals*, 521 F.3d at 316-17 (finding conduct to be "severe or pervasive" when Black

Muslim employee was called "jihadist" among other slurs "over and over;" was "harassed about . . . his kufi and beard;" and was "told that [his supervisor] had a problem with [him] leaving his desk to pray"). Therefore, this factor cuts in favor of severity and pervasiveness.

Finally, the Court considers whether Murphy's conduct "unreasonably interfere[d] with [Stewart's] work performance." *Wormuth*, 54 F.4th at 211. After years of facing false allegations and religious discrimination, Stewart did not receive a promotion in 2021 ("2021 PAF"). Dkt. 77 ¶ 168. However, Stewart also alleges that during this same time period, he was "appointed . . . as the new team lead" for a project; that he was "assigned increasingly important job responsibilities;" that he was a "top performer according to every matrix;" and that his "work was good." *Id.* ¶¶ 66-69. Indeed, in Stewart's email reporting the discrimination to DIA's Chief of Staff, he stated "[a]part from Mr. Cartwright, my work experience is quite peaceful." *Id.* ¶ 107. Stewart's own words demonstrate that his work performance was not affected by Murphy's conduct. This factor does not cut in favor of finding severity and pervasiveness. Despite Stewart's failure to allege that Murphy's discrimination affected his work performance, "no single factor" of the test for severity and pervasiveness "is dispositive." *Sunbelt Rentals*, 521 F.3d at 315.

Stewart further alleges Murphy's "false and retaliatory comments . . . led to [Stewart] not receiving a promotion in May 2021." Dkt. 77 ¶ 52. Failing to receive a promotion is a sufficient fact to allege "a change in terms and conditions of employment." *Sunbelt Rentals*, 521 F.3d at 315. Therefore, due to the above analysis, Stewart alleges sufficient facts to state a hostile work environment claim for religious discrimination under Title VII. The Government's second motion to dismiss as to Count I is denied.

b.  *Stewart Alleges Sufficient Facts to State Severe and Pervasive Disability Discrimination under the Rehabilitation Act*

The Court next considers if Stewart's allegations regarding disability discrimination establish a hostile work environment claim under the Rehab Act. 29 U.S.C. § 791, *et seq*. As stated above, courts evaluate hostile work environment claims under the Rehab Act using the Title VII framework. The Government argues this count should be dismissed for two reasons: (i) Stewart fails to allege any misconduct was because of his disability, and (ii) Stewart fails to allege any misconduct was severe or pervasive. Dkt. 81 at 13-15. The Court addresses each of these arguments in turn.

To prevail on a hostile work environment based on disability discrimination, a plaintiff must allege that mistreatment occurred "because of the [plaintiff's] protected class"—i.e., because of plaintiff's disability. *Katz v. Dep't of Justice*, 2022 WL 2375162, at *4 (E.D. Va. June 30, 2022) (citing *Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997)). A supervisor's mere knowledge of a plaintiff's disability, even when paired with later misconduct, does not establish causation. *See Smith v. McCarthy*, 2021 WL 4034193, at *27 (D. Md. Sept. 3, 2021) ("Smith makes it clear that her supervisor and others knew of her disability. But, that does not suffice."). Rather, a plaintiff must prove that "but for" their disability, the misconduct would not have occurred. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000).

Stewart alleges that Akers, Gayle, and Cartwright "engaged in years of misconduct for the sole purpose of triggering" his PTSD, including "perpetuat[ing] a disinformation operation" that culminated in the 2021 PAF. Dkt. 77 ¶ 15, 16. Akers allegedly "gave [Stewart] a negative rating . . . because of [his] [d]isability" and "informed [Stewart] that his (Akers') input needed to be consistent with [Stewart's] [d]isability and his suitability for promotion and medical condition." *Id.* ¶¶ 58-59. Cartwright allegedly "refused to acknowledge [Stewart's] [d]isability

11

despite medical information given to him and the fact that DIA had provided [Stewart] with a reasonable accommodation," all while "attempt[ing] to trigger" Stewart "with a concerted effort toward harassing" him. *Id.* ¶¶ 86, 88. Additionally, Cartwright allegedly "published multiple false statements" about Stewart and "commonly text[ed] [Stewart] at abnormal times" "in an attempt to trigger his [d]isability [s]ymptoms." *Id.* ¶ 89.

Stewart has stated sufficient facts to allege causation. The Government argues that "the alleged false criticism" did not occur because of Stewart's "PTSD diagnosis." Dkt. 81 at 13. However, false allegations of "behavioral issues," such as "multiple angry outbursts," "aggressive and combative behavior," and "professional challenges with peers" all relate directly to Stewart's disability symptoms of "flashbacks, sleep apnea, GERD, IBS, migraines, nightly nightmares, insomnia, stress, paranoia and anxiety/panic attacks." Dkt. 77 ¶¶ 10, 67, 74, 90. Stewart alleges that the "disinformation operation" was done "in an attempt to trigger his [d]isability [s]ymptoms." *Id.* ¶¶ 16, 89. As each of these allegations ties back to Stewart's PTSD and symptoms, and since Stewart alleges the conduct occurred because of his disability and in order to trigger his symptoms, the Court finds that a reasonable fact finder could find that but for his disability, his supervisors would not have raised these alleged false statements.

The Court now turns to the question of whether the disability discrimination Stewart faced was so severe and pervasive as to change a condition of his employment. *Sunbelt Rentals*, 512 F.3d at 315 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). The Court applies the same test enumerated above—first analyzing the frequency of the conduct. *Wormuth*, 54 F.4th at 211. Stewart alleges that he faced disability discrimination "between 2019 and 2021"—approximately a two-and-a-half-year period. Dkt. 77 ¶ 15. He does not further allege how frequently he faced the discrimination during this time. Other courts in the Fourth Circuit

have allowed hostile work environment claims to survive when employer conduct occurred for similar periods of time. *See, e.g.*, *Leonard v. Townson Univ.*, 2022 WL 3867949, at *8 (D. Md. Aug. 30, 2022) (allowing hostile work environment claim to survive motion to dismiss when plaintiff alleged conduct occurring "over a period of roughly two-and-a-half years"); *Sunbelt Rentals*, 521 F.3d at 310-12 (allowing hostile work environment claim to survive summary judgment where conduct occurred from October 2001 to February 2003). This frequency of discrimination cuts in favor of severity and pervasiveness.

The Court next considers the conduct's "severity" and "whether [the conduct is] physically threating or humiliating, or a mere offensive utterance." *Wormuth*, 54 F.4th at 211. Stewart's allegations, taken as true and in the light most favorable to him, are "humiliating" under this standard. Stewart alleges that these false accusations spanned multiple topics, including his "behavioral issues;" supervisors not "liking him;" female coworkers saying "they would quit if . . . forced to work with [him];" concerns about his "mental state and stability;" his "professional challenges" relating to peers; and that he "intended to deceive management" in relation with an important project. Dkt. 77 ¶¶ 61, 64, 74, 93, 96, 98. These alleged accusations go far beyond claims in cases dismissed by other district courts in the Fourth Circuit. *See, e.g.*, *Gillaspie v. Harker*, 2022 WL 1057180, at *13 (D.S.C. Jan. 24, 2022) (finding lack of severity when hearing-impaired plaintiff faced "negative comments about the volume of [her] voice"); *Barnhill v. Garland*, 636 F. Supp. 3d 592, 604-07 (E.D. Va. 2022) (granting motion to dismiss where plaintiff alleged racial discrimination by being excluded from meetings, being temporarily reassigned, and receiving a negative performance evaluation). Being falsely accused of sexism, aggression, and an inability to work with others is deeply intimidating and humiliating— especially when the accusations are from multiple supervisors. As such, this factor cuts in favor

13

of severity and pervasiveness.

Finally, the Court considers whether Murphy's conduct "unreasonably interfere[d] with [Stewart's] work performance." *Wormuth*, 54 F.4th at 211. As discussed above, Stewart alleges no difficulties or changes to his status at DIA until the 2021 PAF, going as far as to label his work environment "quite peaceful." Dkt. 77 ¶ 107. Thus, this factor is not in support of severity or pervasiveness.

Stewart further alleges that he "was ultimately denied a promotion . . . in connection with false and retaliatory feedback . . . by Cartwright, Murphy, and Akers." Dkt. 77 ¶ 109. Failing to receive a promotion is a sufficient allegation of "a change in terms and conditions of employment" for the purposes of Stewart's second hostile work environment claim. *Sunbelt Rentals*, 521 F.3d at 315. As such, the Court denies the Government's motion to dismiss for Count III, allowing Stewart's claim of hostile work environment under the Rehabilitation Act to survive dismissal. 29 U.S.C. § 791, *et seq.*

### B. Plaintiff Stewart Fails to State a Claim for Retaliation

*a. Stewart does not allege facts sufficient to state a retaliation claim under Title VII*

To state a claim for retaliation under Title VII, Stewart must allege: "(i) that he engaged in protected activity; (ii) that [DIA] took adverse action against him; and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015). The lynchpin of retaliation claims is causation. The Fourth Circuit requires plaintiffs to prove that but for the protected activity, the adverse action would not have occurred. *See Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 (4th Cir. 2017) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.") (citing *Univ. of Texas Sw.*

*Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

In the Fourth Circuit, a plaintiff can allege causation in two ways, by either "showing that the adverse act bears sufficient temporal proximity to the protected activity," or by alleging "facts that suggest the adverse action occurred because of the protected activity." *See Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) (discussing framework in Rehabilitation Act context). Courts find causation through temporal proximity when very little time passes between the protected activity and the adverse action. *See e.g.*, *Wormuth*, 54 F.4th at 219 (finding gap of two months insufficient to prove temporal proximity and causation); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (same). Courts also find causation if there is "evidence of retaliatory animus during the intervening period." *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). Under either prong of the test, a plaintiff cannot allege causation without demonstrating their employer knew of the protected activity. *Strothers v. City of Laurel*, 895 F.3d 317, 336 (4th Cir. 2018) ("[N]o causal connection can exist between an employee's protected activity and an employer's adverse action if the employer was unaware of the activity.").

Stewart alleges he made three reports of religious discrimination: (i) reporting to Cartwright after Murphy modified his uniform to have "protestant orange" boot blousers; (ii) reporting to Cartwright after Murphy offered him a bottle of wine; and (iii) reporting to General Ashley via email on May 14, 2020. Dkt, 77 ¶¶ 30, 37, 40, 47-48. All three reports are "protected activity" under the Title VII retaliation framework. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Stewart has also alleged sufficient facts that a reasonable fact finder could find adverse action, as a "reasonable worker" would feel disincentivized to "mak[e] or support[] a charge of discrimination" if their supervisor responded as Murphy did. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

15

The Court then turns to the question of causation, first analyzing if Stewart's allegations demonstrate temporal proximity. Stewart fails to allege when his reports to Cartwright occurred. Dkt. 77 ¶¶ 37, 47. Without insight into the timing of these reports, the Court cannot conclude there was sufficient temporal proximity between them and the 2021 PAF. Stewart's report to General Ashley fares no better. This report occurred on May 14, 2020, over a year before the 2021 PAF. *Id.* ¶¶ 30, 32. Under the stringent temporal proximity test, this report also cannot be used to prove causation. *See e.g.*, *Wormuth*, 54 F.4th at 219; *Rumsfeld*, 328 F.3d at 151 n.5.

The Court next analyzes if Stewart's allegations regarding retaliatory animus during the intervening period are sufficient to state causation for his Title VII claim. *Smith*, 12 F.4th at 417. First, the Court considers Murphy's alleged retaliation in response to Stewart's reporting him to Cartwright. According to Stewart, "after . . . reporting Murphy to Cartwright, Murphy retaliated" through "making fabricated, poor reviews of [Stewart's] job performance" and through falsely commenting "that [Stewart] had extreme difficulty" working with others, along with other statements. Dkt. 77 ¶ 52. This allegation fails to prove causation. Stewart fails to allege that Murphy knew of his reports to Cartwright. Stewart alleges Murphy "was interviewed" regarding the wine incident; but he does not allege that Cartwright told Murphy about the report, nor does he allege that only Murphy and Stewart knew of the wine incident. *Id.* ¶ 49. Without alleging that Murphy was "aware of the [protected] activity," i.e., Stewart's reports to Cartwright, Stewart fails to allege sufficient facts to state causation at the motion to dismiss stage. *Strothers*, 895 F.3d at 336.

Second, the Court considers both Murphy's and Cartwright's responses to Stewart's reporting to General Ashley. This allegation meets a similar demise. Stewart alleges he reported "religious and disability discrimination" to General Ashley over a private email on May 14,

2020. Dkt. 77 ¶ 30. After this report, Stewart alleges that Murphy and Cartwright "retaliated

against [him]" as they were "now motivated more than ever." *Id.* ¶ 32. Yet, Stewart fails to

allege that General Ashley told Cartwright or Murphy about the May 14, 2020 report. Stewart

merely alleges that "General Ashley represented that he had discussed the matter with the DIA's

Office of General Counsel" and did nothing more. *Id.* ¶ 31. As such, Stewart fails to allege that

Murphy or Cartwright were "aware of the [protected] activity;" i.e., Stewart's report to General

Ashley, therefore, Stewart fails to allege causation. *Strothers*, 895 F.3d at 336.

Since Stewart has failed to allege facts sufficient to state causation under either prong of

the Fourth Circuit's framework for all three of his religious discrimination reports, he does not

state a claim for retaliation under Title VII. *See Smith*, 12 F.4th at 417. As such, the

Government's second motion to dismiss is granted without prejudice for Count II.

> b.  *Stewart does not allege facts sufficient to state a retaliation claim under the Rehabilitation Act*

Courts apply the same retaliation framework when analyzing claims under the Rehab

Act. *See Smith*, 12 F.4th at 416-17. The Court now analyzes if Stewart's allegations sufficiently

state a retaliation claim based on disability discrimination. Stewart's Rehab Act retaliation claim

has similar problems to his Title VII retaliation claim.

Stewart alleges he made three reports regarding disability discrimination: (i) his to

General Ashley on May 14, 2020; (ii) a complaint to Johnny Sawyer, DIA's Chief of Staff,

regarding "ongoing issue[s] with Mr. Cartwright" in March 2021; and (iii) a formal "charge of

discrimination" in June 2021. Dkt. 77 ¶¶ 30, 107, 165. All three of these reports are protected

activity under the Rehabilitation Act.

Stewart likewise alleges that he faced adverse employer action. *Smith*, 12 F.4th at 417

("A plaintiff may establish the existence of facts that suggest the adverse action occurred because

of the protected activity.") (cleaned up). Stewart alleges a pattern of disability discrimination, seen mostly through false statements made to "trigger [Stewart's] [d]isability [s]ymptoms" beginning in 2019 and culminating with the 2021 PAF. Dkt. 77 ¶¶ 32, 99-101. He alleges his supervisors "retaliated" against him, "motivated more than ever" by his reports. *Id.* ¶ 32. Stewart claims two specific instances of this retaliation: (i) "on March 18, 2021 . . . Cartwright stated in a published email that [Stewart] was a poor team player," and (ii) "in or around March 2021" Cartwright, Akers, and Gayle made false statements about Stewart. *Id.* ¶¶ 100-01. Since this conduct would "have dissuaded a reasonable worker from making . . . a discrimination [claim]," Stewart sufficiently alleges facts sufficient to support a finding of adverse employer action. *Burlington N.*, 548 U.S. at 68.

Stewart must next allege sufficient facts to state causation through either temporal proximity or facts showing retaliatory animus. *Smith,* 12 F.4th at 417. The Court begins by evaluating the temporal proximity of Stewart's allegations. Many of Stewart's allegations contain no dates at all; therefore, the Court cannot analyze their temporal proximity. Further, his retaliation allegations with dates contain two problems.

First, several of Stewart's allegations of adverse action occur **before he engaged in protected activity**. Consider Cartwright's March 18, 2021 report. Dkt. 77 ¶¶ 100-01. Cartwright allegedly sent this email four days before Stewart's report to DIA's Chief of Staff and three months before Stewart filed a formal complaint. *Id.* ¶¶ 100-01, 107, 165. This timing shows adverse activity followed by protected activity—a reversal of what Stewart must allege to state a retaliation claim. *See Foster*, 787 F.3d at 253.

Second, Stewart's remaining allegations occur beyond the narrow scope for temporal proximity enumerated by the Fourth Circuit. *See e.g.*, *Wormuth*, 54 F.4th at 219; *Rumsfeld*, 328

F.3d at 151 n.5.Consider his email to General Ashley. Stewart sent the email May 14, 2020. *Id.* ¶ 30. Yet Stewart does not allege retaliatory conduct occurred until "in or around March 2021"—a nine-month delay after his email. *Id.* ¶¶ 30, 100-01. As the Fourth Circuit has determined that even gaps of two months are insufficient to prove causation through temporal proximity, Stewart fails to allege facts sufficient to state causation through temporal proximity.

The Court next evaluates if Stewart alleges causation through facts showing retaliatory animus. As with his Title VII retaliation claim, Stewart fails to allege that General Ashley alerted Cartwright, Gayle, Akers, or Murphy about Stewart's private email reporting discrimination. He merely alleges that General Ashley "acknowledge (sic) receipt" and "promised a response by OIG, which never came." *Id.* ¶ 31, 164. Without alleging how this information spread to Cartwright, Gayle, and Akers, Stewart fails to allege that they were "aware of the [protected] activity," i.e., Stewart's report to General Ashley, and thus does not establish causation. *Strothers*, 895 F.3d at 336.

Because Stewart fails to allege facts sufficient to support a finding of causation for his retaliation claim under the Rehab Act, the Court will grant the Government's second motion to dismiss as to Count IV without prejudice.

### C. Plaintiff Stewart Fails to Allege Facts Sufficient to Support a Finding of "Intolerable Working Conditions," thus Failing to State a Claim for Constructive Discharge

To state a claim for constructive discharge under the Rehab Act in the Fourth Circuit, Stewart must allege facts sufficient to show that he faced "intolerable working conditions" and a "deliberate effort by the employer to force the employee to quit." *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993). Intolerable conditions are governed by an objective standard— "working conditions must be so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Int'l Paper*, 936 F.3d at 211-12 (Title VII case).

Intolerable conditions must be more than "difficult or unpleasant working conditions and denial of management conditions." *Id.* A plaintiff alleging constructive discharge based on a hostile work environment must show "a greater severity" of working condition "than the minimum required to prove a hostile working environment." *Id.* (citing *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316 n.4 (3d Cir. 2006)). Deliberate effort can be proven through either "actual evidence" or "circumstantial evidence" such as "a series of actions that single out a plaintiff for differential treatment." *Shalala*, 991 F.2d at 131.

Stewart does not allege facts sufficient to state a constructive discharge claim, as an objectively reasonable person facing his working conditions would not likely feel compelled to resign. Stewart's descriptions of his workplace demonstrate this. Despite the "disinformation operation" of some, Stewart was "praised by superiors for his knack in getting disparate persons unified in the same direction on a target." Dkt. 77 ¶¶ 16, 24. DIA removed "abjectly false" information about Stewart from his record. *Id.* ¶ 43. Stewart received a reasonable accommodation in connection with his disability. *Id.* ¶ 56. He was assigned "increasingly important job responsibilities." *Id.* ¶ 67. Indeed, Stewart found his work environment to be "quite peaceful." *Id.* ¶ 107.

Even though Stewart found the alleged conduct from Gayle, Akers, Cartwright, and Murphy to cause "physical, mental, and psychological damage," a reasonable person in his position would not likely feel the need to resign when work was "quite peaceful." Dkt. 77 ¶¶ 107, 159. As such, Stewart has not alleged his working conditions were "intolerable" under an objective standard and fails to state a claim for constructive discharge under the Rehab Act. The Government's motion to dismiss for Count V will be granted.

## CONCLUSION

For the above-stated reasons, the Government's second motion to dismiss is **DENIED** as to Count I and III. Dkt. 80. The Government's second motion to dismiss is **GRANTED without prejudice** as to Counts II and IV. *Id.* The Government's second motion to dismiss is **GRANTED with prejudice** as to Count V. *Id.* The Government's first motion to dismiss, dkt. 73, is **DISMISSED AS MOOT.**

It is **SO ORDERED.**

The Clerk's office is hereby directed to send a copy of this memorandum opinion and order to all counsel of record.

Entered this 22nd day of September, 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE