**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
November 13, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Nik Sams
DEPUTY CLERK

JOHN STEWART,

*Plaintiff*,

v.

THE SECRETARY OF DEFENSE,

*Defendant.*

CASE NO. 3:22-CV-00043

MEMORANDUM OPINION & ORDER

JUDGE NORMAN K. MOON

John Stewart is a former Defense Intelligence Agency ("DIA") intelligence officer who worked for the agency from 2014 until his disability retirement in June 2021. Stewart, a Catholic and a veteran suffering from PTSD, is suing the Secretary of Defense, alleging his DIA supervisor Rhett Murphy subjected him to a religiously hostile work environment and that three other co-workers subjected him to a disability-based hostile work environment. Dkt. 77. The Government moves for summary judgment on both claims, Dkt. 117–18; and Stewart moves for summary judgment on his religious hostile work environment claim, arguing the record conclusively establishes the Government's Title VII violation, Dkts. 120–21.

Applying the undisputed facts to the standard for hostile work environment claims, the Government is clearly entitled to summary judgment on Counts I and III of the Amended Complaint because no reasonable juror could find that Stewart was discriminated against because of his religion or his disability.

## I. BACKGROUND

The following facts are undisputed:

1. Stewart worked for DIA from 2014 until his disability retirement in June 2021. Dkt. 134 ¶ 1.[*]
2. He held science-and-technology positions and a Top Secret/SCI clearance. *Id.*
3. In 2017, Stewart became Team Lead in the Directorate of Science and Technology, but he did not supervise anyone. Dkt. 118 ¶ 18.[2]
4. Stewart is Catholic. Dkt. 134 ¶ 2.
5. His faith was openly visible at work through Catholic materials and a Catholic calendar at his workstation. *Id.*
6. He openly discussed his Catholic faith with co-workers and advertised his religious-themed business, Holy Roses, in the DIA breakroom. Dkt. 118 ¶¶ 5–6.
7. Murphy was Deputy Division Chief and later Division Chief during Stewart's tenure at DIA. Dkt. 134 ¶ 5.
8. Theodor Cartwright served as Stewart's Branch Chief and evaluator between 2017 and 2019. *Id.* ¶ 6.
9. Both Cartwright and Murphy knew Stewart was Catholic. *Id.* ¶¶ 3–4.
10. Murphy described Steward as "very religious, very Catholic." *Id.* ¶ 11.

[*] The Government's response in opposition (Dkt. 134) recites Stewart's statement of undisputed facts and either admits, modifies, or denies each numbered paragraph. Therefore, in citing the Government's opposition brief, the Court is also citing Stewart's statement of facts (Dkt. 121). The parties' briefs provide direct citations to the summary judgment record, so the Court will omit those here.

[2] The Government's statement of undisputed fact (Dkt. 118) includes facts that were not included in Stewart's statement of undisputed facts (Dkt. 121). The Court relies on the Government's statement of undisputed facts to the extent Stewart failed to cite record evidence creating a factual dispute. However, in large part, Stewart failed to respond to the Government's undisputed facts with actual evidence and instead responded with allegations or argument. *See generally*, Dkt. 132.

11. In 2018, in response to DIA's gay pride events, Murphy reported overhearing Stewart say "soon Catholics will not be able to work at DIA, it has become a culture of death." According to Murphy, he told Stewart his comments were inappropriate. Dkt. 118 ¶ 81.

12. In approximately September 2018, Stewart observed bright-orange elastic blousers attached to Murphy's uniform pants.[3] Dkt. 134 ¶ 12. Murphy described the orange blousers as his "ode to Protestantism." *Id.*

13. Stewart claims Murphy also said: "I have to have this Protestant orange here because I'm forced to wear all this Catholic green." Dkt. 118 ¶ 33.

14. As part of the conversation in September 2018, Murphy and Steward discussed that orange is often associated with Protestantism and carries significant meaning in the Catholic-Protestant conflict in Northern Ireland. Dkt. 134 ¶ 14.

15. Stewart described the conversation about Northern Ireland as a "mutual shouting match," which concluded when Murphy said, "well, we just better not talk about this at work, okay." *Id.*

16. Stewart complained about the September 2018 incident to Cartwright, and, in response, Cartwright told Murphy it was not a good idea to discuss religion at work. *Id.* ¶ 16.

17. On February 4, 2019, Stewart delivered a letter from his physician to Cartwright, explaining that he has PTSD. *Id.* ¶ 20. The letter documented Stewart's irritability, anxiety, temper, confrontation, sleep disruption, and the increased Gabapentin dosage. *Id.*

---

[3] Between 2014 and 2015, Murphy was working in Israel and needed blousers added to his uniform. Dkt. 118 ¶¶ 25–26. Blousers are an elastic band at the bottom of pants that keep the bottom of the pants tucked into military boots. *Id.* Due to the language barrier with the seamstress who altered the uniform, Murphy received orange blousers instead of green. *Id.* He did not ask for orange blousers and would not have chosen "a bright color" if he had been given the choice. *Id.* In other words, he did not request the orange blousers to make a religious statement or, more specifically, to antagonize Catholics.

18. On April 15, 2019, which was during Holy Week, Murphy entered Stewart's workspace and approached him with a small bottle of wine. *Id.* ¶ 26.

19. When Murphy was living in Israel, he had obtained small quarter bottles of sacramental wine from a gift shop in Cana, Israel. *Id.* ¶ 27. Cana is the location where Jesus first turned water to wine. *Id.* Murphy had brought several bottles of the sacramental wine home with him from Israel. *Id.*

20. Murphy offered Stewart a bottle of sacramental wine as "an act of kindness," knowing Stewart was a devout Catholic, Easter was coming up, and Stewart was going through a tough time because his wife had experienced multiple miscarriages. *Id.*

21. Stewart rejected the wine and reported the wine incident to DIA leadership. *Id.* ¶ 29.

22. Stewart claims that Murphy continued to "make some kind of comment about religion," such as something about Murphy's own church event or "a day that might necessarily be significant on our liturgical calendar." Dkt. 118 ¶ 45.

23. Other than the "uniform incident" in September 2018 and "the wine incident" in April 2019, Stewart could not recall any specific comments about religion. *Id.* ¶¶ 46–48.

24. During Murphy's time as a supervisor at DIA, every person he promoted was Catholic. *Id.* ¶ 89.

25. On April 29, 2019, Elizabeth Gayle—one of Stewart's female colleagues—created a written statement describing concerns about Stewart's anger, volatility, mental state, and stability. Dkt. 134 ¶ 44.

26. On May 24, 2019, Gayle sent another email to Murphy and Cartwright stating that Stewart had made "degrading and sexist comments," and that his insulting "comments and actions are repeatable and have created a hostile work environment."[4] Dkt. 118 ¶ 84.

27. Stewart did not know about Gayle's complaints until after he retired. *Id.* ¶ 87.

28. Several other co-workers complained about Stewart passing off his work to others and being not only unpleasant, but abusive at work. *Id.* ¶¶ 49–61. One colleague thought Stewart would bring a gun to work. Id. ¶ 97. Another said that she would quit if she had to work with him long-term. *Id.* ¶ 122

29. John Daily became Stewart's evaluator between early 2020 and October 2020. *Id.* ¶ 22.

30. In October 2020, Frank Akers became Stewart's supervisor. *Id.* ¶ 23.

31. Stewart's physician states that discussions portraying Stewart as unstable, potentially dangerous, angry, combative, or psychologically suspect were highly distressing and directly overlapped with the symptoms and stigma of PTSD. Dkt. 134 ¶ 68.

32. In April 2021, Stewart made a reasonable accommodation request to work remotely full-time. Dkt. 118 ¶ 14.

33. Prior to this reasonable accommodation request, Akers had allowed Stewart to work 100% remotely given his COVID-19 concerns even though he was not in a "high risk" category. *Id.* ¶ 117.

34. Akers also approved Stewart's request to continue his flexible four-day, 10-hour workweek so that he could see his doctor on Fridays, without requiring any medical documentation. *Id.*

---

[4] According to Gayle, Stewart stated women had been promoted because they wore "miniskirts" and called it "the invasions of the miniskirts." Gayle May 2019 Email, Dkt. 118-29.

35. At various times throughout Stewart's employment with DIA, Cartwright, Murphy and Akers had counseling sessions with Stewart to discuss and improve his performance and his relations with his co-workers.[5] *Id.* ¶¶ 56–57, 120, 136.

36. Stewart retired from DIA on disability in June 2021. Dkt. 134 ¶ 74.

37. Stewart's March 23, 2021 VA benefits letter reflects a 100% combined service-connected evaluation and that he was considered totally and permanently disabled due solely to service-connected disabilities. *Id.* ¶ 77.

## II. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The nonmoving party may avoid summary judgment by demonstrating a dispute of material fact that would allow a reasonable jury could return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive

---

[5] Stewart's supervisors tried over several years to address his performance problems—including the way he spoke to his co-workers; but importantly, they took no adverse employment action against him except a single letter of reprimand in 2019. *E.g.*, *id.* ¶¶ 49–61. That letter addressed his failure to take his supervisor's instructions and his discourteous behavior towards a colleague in Information Technology. *Id.*

evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## III. ANALYSIS

In its September 22, 2025 Memorandum Opinion & Order (Dkt. 85), this Court dismissed all of Stewart's claims except his Title VII religious hostile work environment claim and his Rehabilitation Act disability hostile work environment claim. The Court read Stewart's allegations expansively to give him the benefit of discovery. That reading was overly generous and implied there was something where there was nothing. The Court will do now what it should have done then and enter judgment on behalf of the Government on Stewart's hostile work environment claims.

### A. Religious hostile work environment

To establish a hostile work environment claim based on religion, Stewart must demonstrate the alleged conduct was: (1) unwelcome; (2) because of his religion; (3) subjectively and objectively sufficiently severe or pervasive; and (4) imputable to his employer. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313 (4th Cir. 2008); *Stewart v. Hegseth*, 800 F. Supp. 3d 662, 672 (W.D. Va. 2025). An employer contravenes Title VII by requiring an employee to work in an environment that is hostile to his religion. *Sunbelt Rentals, Inc.*, 521 F.3d 306, 313. However, a hostile work environment claim fails unless "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Brackney-Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 628 (W.D. Va. 2023) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In this case, Stewart points to two specific incidents that he believes created a hostile work environment: (1) Murphy wore orange blousers on his uniform, said the orange was his "ode to Protestantism," and was needed to counter-balance all of the "Catholic green," and discussed the Catholic/Protestant conflict in Northern Ireland; and (2) Murphy gave Stewart sacramental wine he had purchased in Israel. *See supra* (I) ¶¶ 13–15, 18–21. Neither of these incidents support Stewart's harassment theory because: (1) neither is sufficiently severe (even if you consider them collectively), and (2) there are no facts creating an inference of religious animus.

**1. Severity or Pervasiveness**[6]

The conduct giving rise to an abusive work environment must be objectively and subjectively "hostile" and "abusive." *Harris*, 510 U.S. at 21–22. Courts look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277. The ultimate inquiry, though, is whether the conduct is so "extreme" as to "amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Here, Stewart clearly believed that Murphy's conduct was hostile to his religion. That satisfies the subjective prong. In considering the objective prong, *Sunbelt Rentals, Inc.*, which also dealt with a religious hostile work environment claim, is instructive. 521 F.3d at 314. In that case,

---

[6] Stewart relies on two isolated incidents that took place seven months apart. He had previously alleged that Murphy discussed religion with him at other times; however, at his deposition, he could only recall the September 2018 and April 2019 incidents. Dkt. 118-10 at 52 (Stewart Dep. at 51:17–20 ("Q: Do you recall any other conversations about religion with him other than this initial conversation and the conversation about his uniform? A: Not specifically, other than the wine incident.")). Therefore, based on the summary judgment record, no reasonable juror could find that religious comments or discussion were pervasive at DIA during Stewart's tenure.

the plaintiff—who was Muslim—experienced co-workers repeatedly calling him "Taliban" and "towel head" and generally making fun of his beard and his headwear. *Id.* His co-workers also teased him about his short prayer sessions during work hours. *Id.* In finding that this conduct was both severe and unwelcome, the Fourth Circuit noted that "is difficult to see how any employee would welcome derisive behavior directed at his faith." *Id.*

In terms of severity, the September 2018 and April 2019 incidents are nowhere close to the comments and conduct described in *Sunbelt Rentals, Inc.* They are not even in the same solar system.[7] In this case, unlike *Sunbelt Rentals, Inc.*, there is nothing to suggest that Murphy's conduct was derisive towards Stewart's religion. Rather, while he was changing his uniform in Stewart's presence, Murphy joked that his orange blousers reflected his own Protestantism.[8] Dkt. 118 ¶¶ 28–30. The pair then had a heated discussion about religion in Northern Ireland—a topic of historical significance, but one that has little connection to Stewart's personal experience as an

7 *Sunbelt Rentals* is a good example of severe and abusive comments that alter the employee/victim's terms of employment. Other good examples of severe harassment include *Boyer-Liberto*, *Okoli* and *Spriggs*. *See* Boyer-Liberto, 786 F.3d at 280 (4th Cir. 2015) (a supervisor calling the plaintiff a "porch monkey" was sufficiently severe to create a jury issue on race-based hostile work claim); *Okoli v. City Of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (plaintiff "present[ed] a strong claim for hostile work environment" based on sex where, in four months, she experienced (1) disparaging jokes about gays and lesbians; (2) comments about herself and a Jacuzzi fantasy; (3) comments about herself and group sex fantasy; (4) questions about her underwear; (5) comments about sexual relations with another African-American woman; (6) additional inquiries about her sitting on a lap and Jacuzzi fantasy; (7) several incidents of fondling her leg under a table; (8) forcible kissing; and (9) more propositions to join in a Jacuzzi fantasy); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182-84 (4th Cir. 2001) (plaintiff demonstrated race-based harassment was severe and pervasive where he was exposed on a "continuous daily" basis to blatantly racist slurs, including him and other black colleagues being called "monkeys" and the n-word).

8 Murphy said the blousers were "his Ode to Protestantism." Dkt. 118 ¶ 30. And Stewart further claims that Murphy said he added the orange blousers because he was "forced to wear all this Catholic green." Dkt. 118-10 at 50, Stewart Dep. at 49:19–23.

American Catholic working for the DIA outside Charlottesville, Virginia.[9] None of Murphy's alleged comments were directed at Stewart personally or maligned Catholicism. At most, Murphy pointed out his own religion and discussed historical tensions between Protestants and Catholics.[10] This contrasts with the comments in *Sunbelt Rentals, Inc.* where the plaintiff was associated with a terrorist group, called a pejorative term like "towel head," and teased because he prayed.

Nothing about the September 18, 2019 incident suggests that Murphy "aimed to humiliate, ridicule, or intimidate" Stewart, even if his comments were ill-advised. *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). Title VII recognizes that "workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Sunbelt Rentals, Inc.*, 521 F.3d at 315. Murphy's comments about his blousers and the subsequent discussion about Catholic/Protestant tensions in Northern Ireland may have been uncomfortable for Stewart and may have even led to "bruised his feelings"; but Title VII requires Stewart to "roll with the punches" even if Murphy's behavior was "rude" or "callous." *Id.* In sum, the September 18th incident did not create an "abusive atmosphere" at DIA. *Id.*

The April 15, 2019 "wine incident" is even less compelling than the September 18, 2018 "orange blouser" incident. The record evidence shows that Murphy gave Stewart a bottle of wine he had purchased at a holy site in Israel. *See supra* (I) ¶¶ 18–20. Specifically, the bottle was purchased in Cana where Jesus first turned water into wine. *Id.* ¶ 19. Presumably, this wine would

---

9 Stewart also appeared to be an equal contributor to the discussion about religious strife in Northern Ireland. To that extent, if Murphy exhibited Catholic animus (which he did not), Stewart would have been equally guilty of exhibiting Protestant animus. As the saying goes, it takes two to tango.

10 It is unclear why Stewart believes he can openly advertise his Catholicism at work, but Murphy cannot point out he is Protestant.

have been equally meaningful to all Christians regardless of denomination. Stewart has presented no evidence as to why Murphy's seemingly kind gesture was an unwanted jab at Catholics. Absent some explanation as to why the wine incident was offensive or demeaning, Stewart cannot show harassment at all, much less that the harassment was severe as required by Title VII.

In sum, Title VII does not establish a "general civility code for the American workplace."[11] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). It prohibits harassment based on religious animus that is "so extreme" as to "change [the victim's] [] terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* Here, it is hard to even characterize Murphy's actions as harassment—in one instance he made a joke and discussed religious strife *in another country* and in the other instance he offered Stewart wine (which carried equal significant for all Christians) out of kindness. But even if his comments and conduct qualified as harassment, no "reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." *Sunbelt Rentals, Inc.*, 521 F.3d at 315 (citing *Oncale*, 523 U.S. at 81–82). Title VII only protects against real harassment; it does not protect the overly sensitive, eggshell plaintiff. *E.E.O.C. v. Int'l Profit Assocs., Inc.*, No. 01 C 4427, 2007 WL 3120069, at *13 (N.D. Ill. Oct. 23, 2007) ("The [Supreme] Court's hostile work environment cases demonstrate that it intended to construct a test that would prevent eggshell plaintiffs-those who are offended by

---

[11] While it is certainly best practice to avoid discussing religion in the workplace, Title VII is not a nationwide gag order.

comments or actions that would not offend a reasonable person-from recovering under Title VII."). Stewart has not demonstrated severe or pervasive harassment based on his Catholicism.[12]

**2. Intentional Discrimination**

In addition to establishing severity and pervasiveness, Stewart must also establish that any harassment was motivated by religious animus. *See Johnson v. United Parcel Serv.*, Inc., 839 F. App'x 781, 785 (4th Cir. 2021); *see also Sunbelt Rentals, Inc.*, 521 F.3d at 314 ("The EEOC must next establish that the harassment was based on Ingram's religion."). While the conduct does not need to "be accompanied by a contemporaneous statement of animus," *Strothers v. City of Laurel*, 895 F.3d 317, 330–31 (4th Cir. 2018), "a reasonable jury must be able to see the hostility as a product of [religious] animus rather than the kind of personality conflict that pervades many a workplace." *Racklin v. Zeta Global Corp.*, 628 F. Supp. 3d 625, 652 (E.D. Va. 2022). "A plaintiff may show an employer's animosity toward a protected class through direct evidence or evidence of differential treatment of similarly situated employees outside of a protected class." *Nyimpha v. Ross*, 2020 WL 819839, at *7 (E.D. Va. Feb. 19, 2020).

In this case, any possible inference of animus is defeated by: (1) Murphy's unrebutted, non-discriminatory explanations for the September 2018 and April 2019 incidents, and (2) the fact that Murphy repeatedly (and exclusively) promoted Catholics during his time as a DIA supervisor,[13] *see supra* (I) ¶ 24. There is a difference between Murphy discussing his Protestantism and Murphy

---

[12] The summary judgment record suggests that Stewart made offensive comments about female and LGBTQ+ co-workers. However, at any mention of religion (unless he was doing the mentioning), he crumpled. He may wish to consider the irony.

[13] Interestingly, James Mattis, Mark Esper, and Lloyd Austin—the three Secretaries of Defense during the relevant periods of Stewart's employment—were either practicing Catholic or were raised in Catholic households. *See* https://en.wikipedia.org/wiki/Jim_Mattis; https://en.wikipedia.org/wiki/Mark_Esper; https://en.wikipedia.org/wiki/Lloyd_Austin.

being anti-Catholic. And his actions at DIA—by promoting Catholics up the ranks—shows he was not anti-Catholic.

**B. Disability-based hostile work environment**

The elements of an ADA hostile work environment claim are the same as the elements of a Title VII hostile work environment claim. *See Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176–77 (4th Cir. 2001); *Nordan v. Wal-Mart Stores E. LP*, 2025 WL 2408545, at *4 (E.D.N.C. July 21, 2025). Here, Stewart claims that his colleagues purposefully exacerbated his PTSD by complaining about him and his behavior and characterizing him as "dangerous" or "sexist." *E.g.*, Dkt. 118-10 at 167–68 (Stewart Dep. at 166:14–167:14). But some of his alleged "harassers" like Liz Gayle did not even know about his disability. *E.g.*, *id.* (Stewart Dep. 167:13 – 14 ("**Q:** When did you tell Liz (Gayle) that you had PTSD? **A:** I don't remember specifically telling her that."). And Frank Akers didn't know about his PTSD until Stewart had already applied for retirement. *Id.* (Stewart Dep. 108:10–21). It is difficult to infer disability discrimination when several of the alleged harassers did not even know about Stewart's disability at the time they complained about him. Moreover, Stewart admits he did not know about Liz Gayles' complaints until he filed his EEO complaint, *id.* (Stewart Dep. 167:10–12). Therefore, his workplace experience could not have been affected by Gayles' alleged harassment if he did not know about her complaints until the very end of his tenure at DIA.

More fundamentally, though, Stewart has produced zero facts supporting an inference that Gayles, Akers, Murphy or Cartwright had any animus against disabled persons. The record belies any assertion of animus. For example, Akers approved Stewart's reasonable accommodation requests (except the last one, which was mooted by Stewart's retirement). *See supra* ¶¶ 33–34. This included allowing Stewart to work a modified schedule to accommodate doctors

appointments on Fridays and to work 100% remotely during the COVID-19 crisis (even though Stewart was not high-risk and did not meet the criteria for full remote work). Absent proof of intentional discrimination, his hostile work environment claim falters.

Even setting these dispositive flaws aside, Stewart does not attempt to argue how complaints about his behavior are *severe* disability harassment. Instead, he seems to believe that the ADA operates as a gag order that prevents his colleagues from complaining about him because he has PTSD. Not so. His colleagues relayed real concerns about his conduct, and the ADA does not immunize him from criticism or the repercussions of his own bad behavior. Reporting sexist comments, rude behavior, and frightening conduct is not harassment. Period. Accordingly, his disability-based hostile work environment claim fails as a matter of law.

## IV. CONCLUSION

For these reasons, the Government's motion for summary judgment (Dkt. 117) is **GRANTED.** All other motions are **DENIED AS MOOT.**

The Clerk is directed to enter judgment in favor of the Government. The Clerk of Court is further directed to send a copy of this Order to all counsel of record and to strike this case from the Court's active docket.

Entered this 13th day of November, 2026.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE